

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-9-2001

# Gleason v. Norwest Mortgage Inc

Precedential or Non-Precedential:

Docket 00-5112

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Gleason v. Norwest Mortgage Inc" (2001). *2001 Decisions.* Paper 45.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/45

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 9, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5112

CRISTEN M. GLEASON,
        Appellant

v.

NORWEST MORTGAGE, INC.

Appeal from the United States District Court
For the District of New Jersey
D.C. No.: 96-cv-04242
District Judge: Honorable Alfred J. Lechner , Jr.
District Judge: Honorable Katharine S. Hayden

Argued: October 6, 2000

Before: BARRY, AMBRO, and ROSENN, Circuit Judges.

(Filed: March 9, 2001)

        James W. Dabney (Argued)
        Katharine E. Smith
        Pennie & Edmonds, LLP
        1155 Avenue of the Americas
        New York, NY 10036

         Counsel for Appellant

Lawrence M. Rolnick (Argued)
Michael D. Lichtenstein
Lowenstein Sandler, PC
65 Livingston Avenue
Roseland, NJ 07068

Counsel for Appellee

OPINION OF THE COURT

ROSENN, Circuit Judge.

This multi-issue appeal has its origin in the sale of a company subject to an apparently simple "right of first offer." Cristen Gleason ("Gleason") founded U.S. Recognition, Inc. ("USR" or "Company") to develop and sell computer systems and software to search, store, and retrieve real estate listing infor mation. In October 1991, Gleason agreed to sell all of his capital stock in USR to the defendant, Norwest Mortgage, Inc. ("Norwest"), a national mortgage banking company. The sale contract pr ovided that if Norwest decided to sell USR within the firstfive years after the closing date of this sale, it was obligedfirst to offer it to Gleason. If Gleason did not accept the of fer within thirty days, Norwest was free to sell USR to another buyer on terms substantially similar to those of fered to Gleason.

Norwest sold USR to Moore Business Forms, Inc. ("Moore") in 1996. Gleason claims that Norwest neither made him the first offer to buy USR nor sold USR at terms substantially similar to those offered to and accepted by Moore. Gleason moved in a New Jersey state court for a preliminary injunction to restrain Norwest from proceeding with the sale. Norwest removed the action to the United States District Court for the District of New Jersey, where the Court, on October 10, 1996, denied the motion for the injunction. The District Court later granted summary judgment for Norwest and against Gleason. We affirm in part and reverse in part and remand for further proceedings as are consistent with this opinion.

2

I.

Gleason founded USR in 1984 to develop and sell computer systems and software to store, search, and retrieve real estate listing infor mation. On October 25, 1991, Gleason agreed to sell all of the capital stock in the Company to Norwest for $1.3 million. Gleason r emained as President of USR. The stock purchase agr eement ("SPA") included provisions requiring Norwest to maintain USR as a separate profit center for at least five years. Particularly pertinent to this appeal, S 9.2 of the SP A specifically provided:

> [Norwest] agrees that if it decides to sell USR at any time during the first five years after the Closing Date, it will first offer USR to [Mr. Gleason]. [Mr. Gleason] shall have 30 days to accept the offer , and if not accepted within the 30 days, [Norwest] shall be free to sell USR to anyone else on terms substantially similar to those offered to [Mr. Gleason].

In early 1993, Norwest acquired Boris Systems, Inc. ("Boris"), USR's former competitor . As early as September 1995, Norwest began investigating the sale of Boris and USR as a package. Norwest created an "Of fering Memorandum" and other internal and exter nal documents expressing an interest to solicit of fers for its USR and Boris subsidiaries. By early 1996, after preliminary discussions with several potential buyers, Norwest's discussions began with Moore. Commencing in May 1996 and thr ough June and July 1996, the negotiations between Norwest and Moore progressed and intensified. On May 15, 1996, Moore wrote Norwest that it "received corporate approval to proceed with . . . negotiations which will hopefully result in Moore's acquisition of Boris and [USR]." Moore also proposed a price of $11.5 million for both companies and a general outline of a process to "maximize the certainty of closing," including a confidentiality agr eement. Id.

On June 11, 1996, Norwest responded thr ough its investment bank to Moore's proposal, stating it wanted to move toward a definitive agreement with Moore, and would be prepared to cease temporarily pr eparation of a formal auction for Boris and USR if Moore accepted Norwest's

counter-proposal terms, viz: 1) $15 million purchase price; 2) Norwest receives participation rights for two years on any initiatives relating to the origination offirst mortgage loans through any product offerings by Moore; 3) Moore completes its preliminary due diligence pr ocess during any two consecutive day period within nine days of June 11, to be performed off USR's premises; 4) Moore enters a definitive agreement with Norwest by June 28, 1996; 5) Moore must not disclose the possible sale of Boris or USR during due diligence; and 6) Moore pays a $1.5 million break-up fee if it fails to close the transaction. On June 26, 1996, Moore wrote Norwest stating it r eceived corporate approval to proceed with negotiations for the acquisition of Boris and USR, and was making a "non-binding pr oposal" to pay $13.5 million. Moore also proposed other pre- and post-closing procedures.

Gleason first learned about Moore's interest in USR and Boris on June 26, 1996, when Norwest Executive V ice President Mike Keller ("Keller") invited Gleason to dinner and told him that Norwest wanted $14 million for Boris and USR, that Norwest expected to sign an agreement with Moore within a few days, and that the $14 million price was allocated $12 million for Boris and $2 million for USR. Gleason stated that he wanted to buy both companies; Keller was noncommittal.

On July 3, 1996, Moore wrote to Norwest stating that: 1) Moore received corporate approval to proceed with negotiations which hopefully would result in Moore's acquisition of Boris and USR; 2) it would pay $14 million for USR and Boris; 3) it required certain procedures during the pre-closing due diligence process; and 4) the letter was a "non-binding proposal for how Moor e . . . would acquire Boris and [USR]." Norwest responded on July 8, 1996 stating that the proposed terms wer e acceptable, and that it had assigned resources to assist Moor e's pre-diligence process. Moore later produced, at Norwest's request, a "Valuation Estimate Split" attributing $3.5 million of the proposed $14 million purchase price to USR.

On July 19, 1996, Norwest formally offer ed to sell USR's stock to Gleason for $3.5 million, subject to the following terms: 1) Norwest would have a right to participate in any

4

initiatives for mortgage-related transactional services and products offered by USR; 2) a definitive agreement of sale must be entered within thirty days, and Gleason would have to place a "break-up" fee into escr ow upon execution; 3) Norwest would provide transitional accounting and human resources services for the balance of 1996 at no charge; 4) Gleason would have thirty days to accept the offer by formal execution of a mutually agreeable definitive stock purchase agreement and by pr oviding evidence that financing acceptable to Norwest was in place; 5) if Gleason accepted the offer, the purchase must close within 15 days from the date of execution of the definitive agreement; and 6) the due diligence process was limited to no more than three days, and must be performed off-site from USR's operations.

Gleason wrote to Norwest on August 14 stating, inter alia, that: 1) he was interested in acquiring USR and Boris; 2) negotiations with financing sources wer e "encouraging;" 3) the terms Norwest offered wer e unlikely to be met in the time frame proposed; 4) if the price for USR changed, he was entitled to another opportunity to purchase USR; 5) he had questions about how a Norwest software package called "Win-2" would be administered after USR's sale;[1] and 6) he would be interested in a leveraged buyout if negotiations with Moore became difficult.

By August 19, 1996, the day after Norwest's of fer to Gleason expired, the price for Boris and USR of fered by Moore had fallen to $13.5 million. Gleason, by letter dated August 19, 1996, offered Norwest $3.5 million for USR pending clarification of the Win-2 softwar e asset. In that letter, Gleason, explaining that he r etained an investment bank (Alex. Brown) to assist in obtaining financing, also offered $13.5 million for USR and Boris. Gleason also asked for more time to negotiate and close a deal. On August 19, Alex. Brown wrote to Norwest requesting: 1) confirmation of

———————————————————————————————————————————————

1. WIN-2 was a product developed jointly by Boris and USR during Norwest's ownership. WIN-2 was expensive and fraught with technical delays and problems. Its ownership was a factor in talks to sell USR and Boris, especially when sale of the two companies to different buyers was contemplated.

5

the offering price and terms for Boris and USR; and 2) a sample definitive agreement. Norwest did not respond to either the August 19 letters from Gleason and Alex. Brown or the August 14 letter from Gleason. Norwest, however, worked toward executing binding agreements with Moore.

On September 6, 1996, Gleason, moving for a pr eliminary injunction restraining Norwest from selling USR and Boris, brought a civil action against Norwest in the Superior Court of New Jersey, Passaic County. Norwest removed the action to the United States District Court, and successfully opposed the preliminary injunction. On September 24, 1996, in anticipation of the impending sale of USR and Boris, Norwest caused Boris and USR to execute a cr oss-licensing agreement confirming that both USR and Boris had full ownership of WIN-2. On September 27, 1996, Norwest and Moore signed two stock purchase agreements, one for Boris and one for USR, but the parties did not close on the transactions. Moore agreed to pay $3.5 million for USR.

Apparently out of a sense of caution, on September 27, 1996, Norwest again offered to sell USR to Gleason. Norwest stated that it believed Gleason's S 9.2 right had expired unexercised in August, but that a second opportunity would address Gleason's claim that Norwest did not provide him a "meaningful opportunity to exercise" his option. Norwest enclosed a cross-license agreement for WIN-2 (in response to Gleason's query in his August 14, 1996 letter), and a proposed agreement with related schedules. See id. The relevant ter ms of the offer included: 1) Gleason had thirty days to accept; 2) $3.5 million purchase price in cash at closing; 3) closing and execution of an agreement must be completed by 10:00 a.m. on October 28, 1996; and 4) Gleason could perfor m the due diligence process at any time, subject to a confidentiality agreement, off-site from USR's locations.

Moore closed on its purchase of Boris on October 1, 1996. As part of that sale, Moore and Norwest executed a non-competition agreement in which Norwest agr eed not to compete with Boris for five years after closing, and in which Moore allowed Norwest to operate USR in competition with Boris until USR was sold. Moore closed on its purchase of

6

USR on November 1, 1996 after Gleason failed to comply with the acceptance terms in the September 27, 1996 offer.

In February 1997, Norwest moved for summary judgment on Gleason's first amended complaint claims of, inter alia, breach of contract and breach of the implied covenant of good faith and fair dealing. Also in February 1997, the District Court granted Gleason leave to file a second amended complaint adding fraud claims. In May 1997, Norwest moved for summary judgment on the fraud claims. On September 17, 1997, the District Court granted summary judgment against Gleason's breach of contract and fraud claims. On October 2, 1997, Gleason moved for reconsideration based on new evidence, including expert witness testimony developed since March 1997. The District Judge denied the motion to reconsider. On October 15, 1997, Norwest requested that the Court clarify whether it intended to enter summary judgment against the implied covenant of good faith and fair dealing claim. On October 22, 1997, the Court entered summary judgment against that claim.

II.

Before turning to the merits, we must consider, as a threshold matter, our appellate jurisdiction. On January 28, 2000, the parties stipulated to a "final judgment" order under Fed. R. Civ. Proc. 54(b).2 The District Judge stated that all claims were resolved through judgment, settlement, or mootness, except that each party's claim for contractual attorneys' fees and costs under SPAS 8.11 remained outstanding.3 The judge found "no reason for delay in entry

_____

2. Fed. R. Civ. Proc. 54(b) states in r elevant part:

> When more than one claim for relief is pr esented in an action . . .
> the court may direct the entry of a final judgment as to one or more
> but fewer than all of the claims or parties only upon an express
> determination that there is no just r eason for delay and upon an
> express direction for the entry of judgment. . . .

3. SPA S 8.11 provides:

> If any party to this Agreement brings an action or suit against any
> other party be [sic] reason of any br each of any covenant,

7

of this final judgment" and explicitly labeled the order a final judgment. The judge further stated that the outcome of appeals could materially affect the Court's determination of which party prevailed and which party lost. When this Court docketed the appeal, the Clerk warned counsel that dismissal was possible for an unspecified jurisdictional defect. Norwest, without conceding that there was appellate jurisdiction, responded that "a number of cases . . . have discussed the award of counsel fees in a br each of contract case and the finality of an appeal before such an award is made." Gleason responded that the January 28 order of the District Court was "final" within the meaning of 28 U.S.C. S 1291 (final order statute), so that we had jurisdiction to decide the appeal.

Gleason, citing the January 28, 1999 "final judgment" order and Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202-03 (1988), argues that there is appellate jurisdiction under 28 U.S.C. S 1291. Norwest questions whether there is appellate jurisdiction because the attorneys' fee issue turns on a pr ovision in the same contract containing the right of first offer provision. Even though Norwest does not explicitly argue that there is no appellate jurisdiction, we must under the cir cumstances consider our own jurisdiction before reviewing the merits. See Trent Realty Assocs. v. First Fed. Sav. & Loan Ass'n, 657 F.2d 29, 36 (3d Cir. 1981).

When an outstanding claim for attorneys' fees is by a statutory prevailing party, the unresolved issue of those fees does not prevent judgment on the merits fr om being final. See Budinich, 486 U.S. at 202. However, we have held that when attorneys' fees are part of the contractual damages at issue on the merits, a District Court's order delaying quantifying the amount of such fees is non-final for purposes of appeal. See Ragan v. Tri-County Excavating,

_____

agreement, representation, warranty or any other provision hereof, or any breach of any duty or obligation cr eated hereunder by such other party, the prevailing party in whose favor final judgment is entered shall be entitled to have and r ecover of and from the losing party, all costs and expenses incurred or sustained by such prevailing party in connection with such suit or action, including without limitation, reasonable legal fees and court costs . . . .

Inc., 62 F.3d 501, 505 (3d Cir. 1995). "[W]hen an award of attorney fees is based on a contractual pr ovision and is an `integral part of the contractual relief sought,' the order does not become final and appealable until the attorney fees are quantified." Id. Ra gan distinguished claims for attorneys' fees by prevailing parties under statute from claims for attorneys' fees as damages. See Vargas v. Hudson County Bd. of Elec., 949 F.2d 665 (3d Cir. 1991) (recognizing distinction in treatment under S 1291 between fees as an element of damages and fees for a statutory prevailing party). In this case, the claim for attorney's fees is not predicated on a statutory prevailing party provision but on the contractual obligation to pay attor neys' fees "to the prevailing party in whose favor judgment is entered." SPA S 8.11. For all practical purposes, we see no difference under these circumstances, for S 1291finality purposes, between payment of attorneys' fees to a pr evailing party under statute and payment of attorneys' fees under the contract to a "prevailing party." The pr evailing party attorneys' fees provided for in SP A S 8.11 are not an integral part of the contractual relief sought; the issue of which party prevailed in the litigation on the merits is collateral to the substantive issues on appeal and does not prevent judgment on the merits from beingfinal.

The Rule 54(b) "final judgment" was final for purposes of appeal of the substantive determinations. Thus, we have appellate jurisdiction. See 28 U.S.C. S 1291. Gleason and Norwest are citizens of different states, and the amount in controversy exceeds $75,000; subject matter jurisdiction exists. See 28 U.S.C. S 1332.

III.

Gleason appeals the summary judgment against his breach of express contract, breach of implied covenant of good faith and fair dealing, and fraud claims. W e exercise plenary review of a grant of summary judgment, applying the same standard as the District Court. See Kiewit Eastern Co., Inc. v. L & R Constr. Co., 44 F .3d 1194, 1198 (3d Cir. 1995). The Court may grant summary judgment only if, after drawing all reasonable inferences fr om the underlying facts in the light most favorable to the non−moving party,

9

there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See id. In determining whether the District Court err ed, we must view the facts as asserted by the nonmoving party as true if they are supported by affidavits or other admissible evidentiary material. See Becton Dickinson & Co. v. W olckenhauer, 215 F.3d 340, 343 (3d Cir. 2000); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir . 1996). A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995). Summary judgment is appropriate for the moving party if no r easonable juror could conclude that the non-moving party should pr evail. See Orsatti v. New Jersey State Police, 71 F .3d 480, 482 (3d Cir. 1995).

In this case, the SPA states that it "shall in all respects be governed by, and enforced and interpr eted in accordance with, the laws of the State of Minnesota." See SPA S 8.14. We perceive no error in the District Court's determination that Minnesota law applies to the breach of contract and implied duty of good faith and fair dealing claims. The District Court also appropriately applied New Jersey law to the fraud claim because there is no significant distinction between the substantive laws of fraud among the interested states of New Jersey, Iowa, and Minnesota. Neither party contests the District Court's choice of law decisions.

A. Breach of S 9.2 of 1991 SP A

The objective of judicial interpretation of disputed contract provisions is to give effect to the discernable intention of the parties, ascertaining that intent, if possible, by examining the contractual plain language. See Midway Ctr. Assocs. v. Midway Ctr., Inc. , 237 N.W.2d 76, 78 (Minn. 1975). A contract is unambiguous if the Court, without looking to extrinsic evidence, can determine the meaning of the contract's language. See ICC Leasing Corp. v. Midwestern Mach. Co., 257 N.W.2d 551, 554 (Minn. 1977). The determination of whether a contract ter m is clear or ambiguous is a question of law. See Goebel v. North Suburban Agencies, Inc., 567 N.W.2d 511 (Minn. 1997). A contract is ambiguous if, based on its language alone, it is

10

reasonably susceptible of more than one interpretation. See id. Whether a contract is ambiguous depends on the meaning assigned to words or phrases in accor dance with the apparent purpose of the contract as a whole. See id.

S 9.2 of the SPA states:

> Right of First Refusal to Repurchase.
>
> [Norwest] agrees that if it decides to sell USR at any time during the first five years after the Closing Date, it will first offer USR to [Mr. Gleason]. [Mr. Gleason] shall have 30 days to accept the offer , and if not accepted within the 30 days, [Norwest] shall be free to sell USR to anyone else on terms substantially similar to those offered to [Mr. Gleason].

The threshold question is a determination of the extent of the legal right provided by S 9.2 to Gleason for the repurchase of USR. Gleason and Norwest contest whether S 9.2 provides a "right of first of fer" or a "right of first refusal." This is a question of law, the answer to which lays the groundwork for every issue on appeal.

Were we to consider the substantive language of S 9.2 as giving Gleason the right of "first offer" to purchase, as he argues on appeal here, we would declar e the provision void for vagueness. No price for the property isfixed in S 9.2, nor are any terms or conditions of sale. Nor does S 9.2 set a method for ascertaining a sale price. See Portnoy v. Brown, 243 A.2d 444, 447 (Pa. 1968) ("[P]rice is an essential ingredient of every contract for the transfer of property and must be sufficiently definite and certain or capable of being ascertained from the contract between the parties."); Restatement (Second) of Contracts S 33(1), (3) (1981); see also I Richard A. Lord, Williston on Contracts S 4.18 (1999). On the other hand, if S 9.2 is construed, as we think the parties truly intended at the time the instrument was executed, as a right of first refusal,4 then the price and

_____

4. Gleason's pleadings, early affidavits, and pre-litigation correspondence
consistently refer to S 9.2 as a right offirst refusal, and support our construction of this section. Gleason intended to possess a right of first refusal, not a right to first offer . His altered position, presumably

11

terms are determined by refer ence to the same terms offered by a bona fide third-party purchaser. Thus, a right of first refusal, also known as a preemptive right, empowers Gleason with a preferential right to r epurchase USR on the same terms offered by a bona fide purchaser. In the absence of such a construction, this naked right of"first offer" can have no legal significance or preemptive right whatsoever. Without a price, ter ms, or conditions, a right of first refusal creates a dormant right of preemption, the right to receive an offer before others do, but based on third party information. The right cannot be exer cised until receipt of a bona fide third party of fer. Once the holder of a right of first refusal receives notice of a third party's offer with price and terms, the right of first r efusal is transformed into an option. See 17 C.J.S. S 56 (1999).5

_____

precipitated by his new counsel on appeal, does not change the clear intent of the parties when the contract was for med and when Gleason attempted to exercise the provision. See Appx. 1665 (Gleason's affidavit in opposition to motion for summary judgment stating, "When I negotiated the sale of USR to Norwest which closed on May 1, 1992, I had at least three major objectives: (a) to take back a Right of First Refusal to repurchase USR if Norwest ever decided to sell it; . . . ." See Appx. 287, 295 (Gleason's Amended and Supplemental Complaint, twice alleging violation of his "Right of First Refusal," and never mentioning any right of first offer). See also Appx. 17, 19, 20, 28, 31, 46, 1356.

5. We do not hold that a right of first offer is not recognized under the law as distinct from a right of first refusal. A right to receive a first offer may exist if the contract provides price and other relevant terms, or a means of ascertaining them. But a bald "right offirst offer," as exists here, is meaningless and void unless the parties intended to create a right of first refusal. Contractual language providing for a first offer to sell in reality may be read "as a rightof first refusal." Lind v. Vanguard Offset Printers, Inc., 857 F. Supp. 1060, 1065 (S.D.N.Y. 1994). Lind also involved the purchase of stock with an agr eement on the part of the purchaser that if he decided to sell his stock,"he must first offer it back to [the seller]." Id. "A right of first refusal, also known as a preemption or preemption right, requires the seller, when or if he or she decides to sell, to first offer the property to the holder of the right, either at a stipulated price or at the price and on the ter ms the seller is willing to sell." Allison v. Agribank FCB, 949 S.W . 2d 182, 186 (Mo. Ct. App. 1997). Minnesota law is in accord. See Henry Simons Lumber Co. v. Simons, 44 N.W.2d 726, 727 (Minn. 1950). Accor d, Hood v. Hawkins, 478 A.2d 181, 185 (R.I. 1984).

Under the basic rule of contract construction, we ascertain and give effect to the intention of the parties as expressed in the agreement. To this end, we construe the contract as a whole, giving effect to every portion of the instrument, if possible, and utilizing that construction rendering the agreement legal rather than one which makes it void." See 11 Richard A. Lor d, Williston on Contracts S 32:11 (1999). Consistent with our construction of S 9.2, the caption of the section identifying Gleason's right to repurchase states, "Right of First Refusal." We are mindful, however, of language in the SPA r emoving legal effect to captions. See SPA S 8.7.

Thus, giving Gleason as the non-moving party and the subject of the provisions of S 9.2 the benefit of all inferences, we conclude that S 9.2 of the SPA gave Gleason not a right to notice of a decision by Norwest to sell, but under the facts of this case, a preemptive"right of first refusal," effective upon Norwest's r eceipt of a bona fide third party offer. We now turn to whether Norwest complied with Gleason's preemptive right.

The District Court held that there were no disputed issues of material fact and that Norwest: acted consistently with the clear and unambiguous terms of the SP A when it negotiated with Moore; made the first of fer of sale to Gleason and waited thirty days for Gleason to r espond to the offer; and sold to Moore after thirty days at substantially similar terms.

Gleason argues on appeal that five disputed issues of material fact remain: 1) whether Norwest decided to sell before it offered USR to Gleason, thus purportedly breaching the SPA; 2) once it decided to sell USR, whether Norwest first offered USR to Gleason; 3) whether the non-financial terms offered to Moor e were substantially similar to those offered to and rejected by Gleason; 4) whether the $3.5 million price offered to Gleason was substantially similar to the price Moore paid; and 5) whether Gleason suffered any loss, detriment, or injury.

### 1. Norwest's Decision to Sell

The parties contest when Norwest decided to sell USR, but this is not a material fact. Gleason argues that as soon

13

as Norwest decided to sell USR, Norwest was r equired immediately to make an offer to Gleason underS 9.2. But S 9.2 does not require such action. The date Norwest decided to sell is only relevant to whether it was "during the first five years after the closing date" of Gleason's sale to Norwest. The parties agree that Norwest decided to sell USR during the five year period; that ends the inquiry. The timing of the sale, whether determined by tax, marketing or other considerations, remained at all times within Norwest's control so long as it first gave Gleason an opportunity to purchase USR on substantially similar ter ms as those appearing in Moore's bona fide offer . To the extent that the District Court found or implied that Norwest decided to sell on any given date, that finding or that implication is irrelevant. The "Offering Memorandum" that Norwest produced in 1995 was an invitation to negotiate; it was not a legal offer for sale. Gleason attempts to construct a disputed issue of material fact, when the language of S 9.2 can only be reasonably read to create a right of first refusal, especially on the facts of this case.

2. Whether Norwest first offered USR to Gleason

Gleason argues strenuously that once Norwest decided to sell USR, Norwest was required to communicate with Gleason first and that Norwest's overtures to third parties like Moore breached S 9.2.

Section 9.2 gives Gleason the right of first r efusal, not a right to first negotiation. As we construe S 9.2, the word "first" in the phrase "first offer" means only that Gleason was to have been given the opportunity to exer cise his right of first refusal. Norwest could have valued USR strictly with accounting information, but nothing in S 9.2 prevented Norwest from ascertaining USR's value by exploring the marketplace and soliciting offers to pur chase. "Frequently, negotiations for a contract are begun between parties by general expressions of willingness to enter into a bargain upon stated terms, and yet the natural construction of the words and conduct of the parties is that they are inviting offers, or suggesting the terms of a possible future bargain, rather than making positive offers." 1 Richard A. Cord, Williston on Contracts S 4:7 (4th ed. 1999).

14

On July 19, 1996, Norwest offered to sell USR to Gleason, thus providing him with the opportunity to exercise his right of first refusal. Until then, Norwest had not sold USR to Moore or anyone. Therefor e, any prior negotiations, communications, or conversations with regard to the sale of USR to Moore or anyone else ar e irrelevant and any factual disputes as to those matters ar e not material.

### 3. Substantial similarity

Section 9.2 permitted Norwest to sell USR to a third party only if Norwest first offered it to Gleason on terms substantially similar to those offered by the third party. Gleason argues that Norwest breachedS 9.2 by selling USR to Moore on terms more favorable than those offered to Gleason.

#### a. Non-financial terms

Generally, a determination of substantial similarity would be a jury issue, but the non-price terms that Norwest offered to Moore and Gleason wer e so close that no reasonable jury could find that they wer e not substantially similar. The July 19, 1996 offer to Gleason required that: 1) Norwest would have a right to participate in any initiatives for mortgage-related transactional services and products offered by USR; 2) a definitive agr eement of sale must be entered, and Gleason would have to pay a "br eak-up" fee into escrow upon execution; 3) Norwest would pr ovide transitional accounting and human resour ces services for the balance of 1996 at no charge; 4) Gleason would have thirty days to accept the offer by for mal execution of a mutually agreeable definitive stock pur chase agreement and by providing evidence that financing acceptable to Norwest was in place; 5) if Gleason accepted the of fer, the purchase must close within fifteen days fr om the date of execution of the definitive agreement; and 6) due diligence was limited to no more than three days, and had to be performed off site from USR's operations. Gleason argues that Norwest gave Moore: 1) an indefinite period to conduct on-site due diligence; 2) no deadline for execution of a stock purchase agreement; 3) no obligation to pay a "break-up"

15

fee; 4) an "out" in the event Moore was unable to conclude employment agreements for key individuals; and 5) a non-competition agreement. See Appellant Reply Br. 16-17. Gleason's five objections concern "pr e-closing" terms of USR's sale to Moore.

The District Court reasoned that the longer deadlines for Moore did not amount to a breach becauseS 9.2 provides only thirty days to Gleason to accept the of fer. The restrictive pre-closing terms did appear to hamper Gleason's ability to accept Norwest's two of fers, but Gleason only bargained for thirty days to accept the offer. The District Court did not specifically discuss the stress between the thirty-day provision in S 9.2 and the longer term given to Moore.

Substantial similarity is not lacking among the non-financial terms. Independent review of Norwest's two offers to Gleason and the final terms of sale to Moore shows that they were substantially similar. A br eak-up fee appears to have been contemplated between Norwest and Moor e as early as June 1996. See June 11, 1996 letter from Norwest by UBS Securities, to Moore. Moore had mor e time for due diligence because SPA S 9.2 allowed Norwest to limit Gleason's due diligence to thirty days. Gleason had been President of USR through August 1996, and presumably was familiar with its operations and needed far less time and access to USR's financial statements than Moor e did. The non-competition agreement between Norwest and Moore was entered after Gleason's first offer expired, and thus cannot be fairly used against Norwest as an additional term of sale.

b. Price terms

The most significant term of the offer to sell concerned the price for USR. If the price offered to Gleason was artificially excessive, this would in all pr obability discourage Gleason's efforts to purchase and would promote Norwest's persistent plan to conclude successfully the package sale of both USR and Boris to Moore. Gleason ar gues that Norwest's $3.5 million price offer was generated improperly because it was an arbitrary proration of Moor e's combined

16

valuation of USR and Boris. He argues that Moore and Norwest "padded" USR's price and understated Boris's price to obstruct Gleason from acquiring USR and to allow Norwest to "package sell" its two subsidiaries. Gleason argues that Moore actually paid less than $3.5 million for USR, and paid more than $9.5 million for Boris, resulting in a purchase at terms substantially different from those offered to Gleason. Gleason produced documentary and expert evidence that: 1) Moore had valued Boris at $10.5 million in July 1996, and reduced its value by $1 million by September 27, 1996; and 2) the $3.5 million price was "generated by adding $836,000 of additional and undocumented `synergies.' " Appx. 2905 (expert report of Winston Himsworth). Norwest responds that Gleason never raised his "padded pricing" argument before the District Court, and that he cannot raise it now for the first time.

The ruling on a motion for summary judgment is to be made on the record the parties have actually presented, not on one potentially possible. See Shafer v. Reo Motors, 205 F.2d 685, 688 (3d Cir. 1953). Generally, barring exceptional circumstances, like an intervening change in the law or the lack of representation by an attorney, this Court does not review issues raised for the first time at the appellate level. See Gardiner v. Virgin Islands Water & Power Auth., 145 F.3d 635, 646 (3d Cir. 1998) (citing United Parcel Serv. v. Intern. Broth. Local No. 430, 55 F.3d 138, 140 n.5 (3d Cir. 1995)). Although we have discretion to review an argument not raised in the trial Court, we ordinarily refuse to do so.

Gleason argues that his submissions between the close of discovery and the District Court's ruling on the motion for summary judgment contained support for the "padding" argument, and should have been considered in response to the motion for summary judgment. Gleason also suggests that the District Court should have inferred or implied the padding argument because of the severe risk of price manipulation in a package deal where part of the package is subject to a right of refusal.

On August 29, 1997, nearly a month before the Judge made his first ruling on the motions for summary judgment, Gleason submitted the declaration of Winston E. Himsworth ("Himsworth") in support of an expert report

17

concerning USR's proper valuation. In his declaration, Himsworth concluded that a proportionate price for USR could have been no more than $2.6 million, far less than the $3.5 million Norwest offered Gleason. Some courts have held that "allocations of price to elements of a package may readily be manipulated to defeat contractual rights of first refusal." See, e.g., Pantry Pride Enters., Inc. v. Stop & Shop Co., 806 F.2d 1227, 1231–32 (4th Cir . 1986); see also Gyurkey v. Babler, 651 P.2d 928 (Idaho 1982) (collecting cases); Hinson v. Roberts, 349 S.E.2d 454 (Ga. 1986). Although the cited cases concern primarily sales of real property and are factually distinguishable from this case, they establish the principle that we find contr olling: allocations of price by interested parties to elements of a package may readily be manipulated to defeat contractual rights to substantially similar price terms. In deciding the motions for summary judgment, the District Court should have scrutinized carefully the financial evidence the parties produced. Himsworth's report, combined with the strong inherent potential for price padding between Norwest and Moore, as exacerbated by Norwest's reliance on an appraisal by a prospective purchaser , placed the padding issue before the District Court.

The evidence in the record presents a dispute of material fact concerning whether Norwest and Moor e padded USR's price and valuation. Accordingly, we will r emand for hearing and fact finding on the price terms as they relate to substantial similarity. On remand, the District Court must consider loss, detriment, or injury if Gleason proves that there was this breach of the SP A. His damages, if any, will be a question of fact for the jury.

B. Breach of Implied Covenant of Good Faith and Fair Dealing

The District Court dismissed this claim, reasoning that Minnesota does not recognize a separate or independent claim for breach of the implied covenant of good faith and fair dealing.

In Minnesota, "every contract includes an implied covenant of good faith and fair dealing." In re Hennepin County 1986 Recycling Bond Litig., 540 N.W .2d 494, 502

18

(Minn. 1995) (requiring that one party not unjustifiably hinder other party's performance of contract);6 Sterling Capital Advisors, Inc. v. Herzog, 575 N.W . 2d 121, 125 (Minn. App. 1998). One who frustrates the satisfaction of a condition precedent cannot take advantage of that failure. See Tolzman v. Town of Wyoming , No. C1-98-1533, 1999 WL 109604 (Minn. App. 1999). "Bad faith" is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties. See Lassen v. First Bank Eden Prairie, 514 N.W.2d 831, 837 (Minn. App. 1994).

If a jury finds that the price terms wer e not substantially similar, it could also reasonably find that Norwest hindered Gleason's performance under SPAS 9.2. As discussed above, package pricing provides immense power to manipulate the terms of the proposed transaction and to bloat the offering price for the USR segment to Gleason. Norwest may have abused its power.

Norwest argues again that Gleason did not pr eserve this issue for appeal because he failed to raise the ar gument in the District Court. However, Gleason's opposition to Norwest's motion for summary judgment states "[f]or the reasons set forth above with respect to Norwest's conduct in breaching SS 9.1 and 9.2 of the SP A, as well as its attempt to cheat Gleason on his Employment Agr eement, significant material factual issues are pr esented with respect to [the implied duty of good faith and fair dealing claim]." But the District Court did not consider any of Gleason's claims under the implied warranty because of its errant conclusion that Minnesota law does not r ecognize such a cause of action. The District Court should be in a position to consider the issue in toto on r emand.

C. Fraud

The District Court held that Norwest made no material

_____

6. Hennepin County appears to have implicitly overruled the holding in Wild v. Rarig, 234 N.W. 2d 775, 790 (Minn. 1976), that a claim for breach of contract and breach of the implied covenant of good faith and fair dealing will not be recognized under Minnesota law if both claims arise from the same conduct.

misrepresentations to Gleason, and that Gleason suffered no damages because he received all to which he was entitled under the SPA. Gleason argues he suffered damages from fraud because: 1) Norwest did not offer USR to him in December 1995 when it began soliciting bids; 2) Keller knowingly and intentionally lied in r esponse to Gleason's inquiries about whether Boris and USR wer e for sale; and 3) Norwest's alleged intentional material misrepresentations had an adverse ef fect on Gleason's ability to finance an acquisition of USR.

Keller and Norwest had no duty to disclose to Gleason that Norwest was negotiating to divest USR and Boris. Norwest's duty under the SPA was limited to of fering USR to Gleason before selling it to someone else at substantially similar terms. Norwest argues that it discharged all of its duties to Gleason by making its two offers, and that regardless, New Jersey law does not r ecognize tort and contract claims based on the same underlying facts. We disagree for reasons set forth below.

### 1. Concurrent Fraud and Contract Claims

No New Jersey Supreme Court case holds that a fraud claim cannot be maintained if based on the same underlying facts as a contract claim. More than ten years ago, we stated that:

> The question of the continuing validity of fraud claims in cases involving frustrated economic expectations under New Jersey law is very complex and troublesome. The United States District Court for New Jersey unequivocally has held that the New Jersey Supreme Court's reasoning in Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 489 A.2d 660 (1985), though not explicitly addressing fraud claims, "leads . . . to the conclusion that, as between commercial parties New Jersey will not countenance" claims for fraud other than fraud in the inducement. Unifoil Corp., 622 F. Supp. at 270–71. Spring Motors held that "as among commercial parties . . . contract law, . . . provides the more appropriate system [as compared to tort law] for adjudicating disputes arising

20

from frustrated economic expectations." 489 A.2d at 673.

Contrary to this proposition, the New Jersey Superior Court after Spring Motors has upheld fraud claims between commercial parties, see Perth Amboy Iron Works, Inc. v. American Home Assurance Company, 226 N.J. Super. 200, 543 A.2d 1020 (App. Div. 1988), [aff'd 571 A.2d 294 (N.J. 1990)]. No New Jersey court, though, has explicitly considered whether these claims are barred by Spring Motors. Because we determine that plaintiff fails to allege sufficient facts to support its claim of fraud, making summary judgment proper , we decline to wade into this morass.

Vanguard Telecom. v. So. New England Tel., 900 F.2d 645, 654 (3d Cir. 1990) (Rosenn, J.). The same"morass" exists today. The New Jersey District Courts still hold that fraud claims not extrinsic to underlying contract claims are not maintainable as separate causes of action. See, e.g., Lo Bosco v. Kure Engineering Ltd., 891 F . Supp. 1020, 1033 (D. N.J. 1995). New Jersey state courts have not agr eed with the District Courts' interpretation of Spring Motors. The New Jersey Supreme Court still has not decided the issue. We will avoid predicting New Jersey law by deciding the fraud issue on its merits, as we did in V anguard.

2. Merits

Under New Jersey law, legal fraud is "a material misrepresentation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." Jewish Center of Sussex County v. Whale, 86 N.J. 619, 432 A.2d 521, 524 (1981). Deliberate suppression of a material fact that should be disclosed is equivalent to a material misrepresentation (i.e., an affirmative false statement). See Strawn v. Canuso, 140 N.J. 43, 62, 657 A.2d 420 (1995). In other words,"[s]ilence, in the face of a duty to disclose, may be a fraudulent concealment." Berman v. Gurwicz, 189 N.J. Super. 89, 93, 458 A.2d 1311 (Ch. Div. 1981), aff'd, 189 N.J. Super. 49, 458 A.2d 1289 (App. Div.), certif. denied, 94 N.J. 549, 468

21

A.2d 197 (1983). The concealed facts "must be facts which if known . . . would have prevented [the obligor] from obligating himself, or which materially incr ease his responsibility." Ramapo Bank v. Bechtel , 224 N.J. Super. 191, 198, 539 A.2d 1276 (App. Div. 1988). A party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party "expressly reposes a trust and confidence in the other." Berman, 189 N.J. Super. at 93-94, 458 A.2d 1311.

Even if Keller knowingly and intentionally lied in response to Gleason's inquiries about whether Boris and USR were for sale, this cannot be the basis of a fraud claim here. Because Keller and Norwest had no duty to disclose to Gleason negotiations with potential buyers, Keller's failure to disclose pending, amorphic negotiations is not material and, thus, not actionable.7 Furthermore, we note that Keller was bound at that time to remain silent during conversations with Gleason because of a confidentiality understanding between Norwest and Moore.

Although Norwest may have breached the SP A by failing to offer Gleason the same price it offer ed to Moore for USR, we will not reverse and remand on the fraud claim. It may have been possible for Gleason to establish fraud by proving that Norwest intentionally misr epresented a material term (price), causing Gleason damage. Gleason's Second Amended and Supplemental Complaint, however ,

_____

7. Of course, we do not say that one may with impunity affirmatively tell material lies in the course of a business transaction because of the lack of an agreement to disclose information to another. Rather, we reason that, in this particular instance, the absence of a duty on Norwest's part to inform Gleason with respect to thir d-party negotiations that might later influence his dormant right of first refusal weakens any notion of "materiality." Stated differently, Gleason's fraud claim fails not because Norwest was permitted to lie to him, but because the parties' contractual relationship was such that the purported lie was immaterial to Gleason's eventual exercise -- or failure to exercise -- his right of first refusal. This
is a subtle yet important distinction which both r einforces the law of Jewish Center of Sussex County while simultaneously disposing of Gleason's fraud claim.

22

alleges fraud concerning only the misstatements we found insufficient above. Therefore, summary judgment on the fraud claim will be affirmed.

IV.

Accordingly, the judgment of the District Court will be affirmed in all respects except as to Counts II and V of the Second Amended and Supplemented Complaint. As to those counts, the judgment is reversed and the case r emanded to the District Court for fact finding on the issues discussed above and for such further proceedings as ar e consistent with this opinion. Costs taxed against the appellee.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit