2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit



3-6-2007

# Amer Society Testing v. Corrpro Co Inc

Precedential or Non-Precedential: Precedential

Docket No. 05-4164

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Amer Society Testing v. Corrpro Co Inc" (2007). *2007 Decisions.* Paper 1395.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1395

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-4164

AMERICAN SOCIETY FOR TESTING & MATERIALS,

<u>Appellant</u>

v.

CORRPRO COMPANIES, INC., MICHAEL BAACH;
WARREN ROGERS; WARREN ROGERS & ASSOCIATES,
INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 02-07217)
Honorable J. Curtis Joyner, District Judge

Argued December 14, 2006

BEFORE: FISHER, CHAGARES, and GREENBERG, <u>Circuit
Judges</u>

(Filed:   March 6, 2007)

Marc J. Sonnenfeld (argued)
Karen Pieslak Pohlmann
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103-2921

  <u>Attorneys for Appellant</u>

William W. Jacobs (argued)

Thompson Hine
127 Public Square
3900 Key Center
Cleveland, OH 44114

<u>Attorneys for Appellees</u>

<hr>

OPINION OF THE COURT

<hr>

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.  INTRODUCTION

In this declaratory judgment action plaintiff, American Society for Testing & Materials ("ASTM"), appeals from the district court's order dated August 10, 2005, and entered August 12, 2005, granting judgment in favor of defendants Corrpro Companies, Inc. ("Corrpro"), Michael Baach ("Baach"), Warren Rogers Associates, Inc. ("WRA"), and Dr. Warren Rogers ("Rogers") (collectively "defendants"). <u>Am. Soc'y for Testing & Materials v. Corrpro Cos.</u>, No. Civ. A. 02-7217, 2005 WL 1941653 (E.D. Pa. Aug. 10, 2005) ("<u>ASTM</u>").  Specifically, the district court found that ASTM had a duty in accordance with its bylaws to indemnify defendants for their attorney's fees and settlement costs in defending against and settling an underlying suit as well as attorney's fees defendants incurred in this action. For the reasons that follow, we will affirm the order of August 12, 2005, in part, dismiss the appeal in part, and remand the case to the district court for further proceedings.

## II.  FACTS AND PROCEDURAL HISTORY

### A.     The Parties

ASTM is a Pennsylvania non-profit corporation whose mission is to provide a forum for volunteer technical experts to

develop and publish standards for materials, products, systems, and services.  ASTM also develops methods for testing different properties and materials.  ASTM has an approximate total membership of 30,000, drawing individuals from academic institutions, government agencies, consulting groups, testing laboratories, and private corporations.  ASTM has 136 technical committees that do the actual work of developing standards.  These committees are broken down further into 2,200 subcommittees and some 6,000 different task groups.  ASTM has a 25-member Board of Directors (the "Board") that meets twice a year and that governs the standard-setting process.  The Board, in turn, has a six-member Executive Committee that acts on its behalf when the full Board is not in session.  Out of ASTM's 30,000 members, approximately 22,000 participate in technical committees and/or subcommittees.

Defendant Corrpro is in the business of providing corrosion control and cathodic protection (i.e., rust/corrosion prevention) services.  At all times relevant to this action, defendant Baach was the Executive Vice President of Sales and Marketing for Corrpro.  Defendant WRA is primarily in the business of providing mathematical and statistical consulting services.  At all times relevant to this action, Rogers was President of WRA.  In addition, Rogers was a member of Corrpro's Board of Directors from sometime in the mid-1990s until 2001 or 2002.

### B.    ASTM's Policies and Procedures

ASTM requires individuals applying for membership to disclose their corporate affiliations.  But ASTM's policies, procedures, and guidelines do not prohibit an individual from participating in a standard-setting activity by reason of his association with or employment by a company with a financial interest in the technical standard on which he is working.

ASTM does not pay or otherwise compensate its members for time they expend on standard-setting activities.  ASTM, however, does provide protection to its members with respect to litigation stemming from that activity.  Specifically, under ASTM Bylaw No. 10.1:

3

Any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a director, officer, employee or agent of the Society, or by reason of the fact that he is or was serving on a committee operating under the auspices of the Society, shall be indemnified by the Society against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Society and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.

ASTM, 2005 WL 19141653, at *4. ASTM Bylaw No. 10.1 essentially tracks 15 Pa. Cons. Stat. Ann. § 5741 (West 1995), which governs indemnification for third-party actions as they pertain to nonprofit corporations.[1]

---

[1]Specifically, 15 Pa. Cons. Stat. Ann. § 5741 provides that:

Unless otherwise restricted in its bylaws, a nonprofit corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation), by reason of the fact that he is or was a representative of the corporation . . . against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with the action or proceeding if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the corporation . . . . The termination of any action or proceeding by judgment, order, settlement or conviction or upon a plea of nolo contendere or its equivalent shall

4

C.    Development of the ES-40 Standard

In 1988, the United States Environmental Protection Agency ("EPA") promulgated regulations under the Resource Conservation and Recovery Act mandating the upgrading of all underground storage tanks ("USTs") by December 22, 1998.  40 C.F.R. § 280.21(a).  The regulations permit the use of the following three alternative methods for upgrading USTs:  (1) complete replacement; (2) replacement of the USTs' interior lining only; or (3) corrosion prevention through cathodic protection in appropriate circumstances.[2]  See id. at § 280.21(b).

Prior to 1994, the only method for assessing USTs over ten years of age that the EPA and states adhering to EPA regulations had approved involved manned-entry internal inspections.  Such inspections most often led to the replacement of the USTs' interior lining, rather than to cathodic protection.  In July 1993, Randall Nelson ("Nelson"), an EPA employee,

_____

not of itself create a presumption that the person did not act in good faith and in a manner that he reasonably believed to be in, or not opposed to, the best interests of the corporation and, with respect to any criminal proceeding, had reasonable cause to believe that his conduct was unlawful.

[2]In its brief ASTM explains that cathodic protection is:

a process through which a low-voltage electrical charge is administered into the soils surrounding the UST.  Metal rods are driven into the soil several feet from the UST, and wires are installed to connect the rods to the UST, establishing an electrical circuit.  The flow of electricity through this circuit retards corrosion of the metallic UST.  Because cathodic protection only slows future corrosion, and does not repair corrosion that has already occurred, it is not an appropriate upgrade for tanks that have already experienced threshold levels of corrosion.

Appellant's br. at 6 n.1 (citing J.A. at 949-50); see also appellees' br. at 5 n.1.

invited a number of persons, including Baach and Rogers, to a preliminary meeting regarding the development of an ASTM standard[3] which would permit alternate methods of UST assessment, including the evaluation of soil conditions around USTs to assess whether and when those USTs would corrode (which, in turn, would determine the most appropriate form of upgrade for a particular UST). Notably, in the late 1970s, Rogers had developed a statistical method for assessing and predicting when USTs would corrode and fail by evaluating variables in the soil surrounding them. The method that Rogers developed came to be known as "meantime to corrosion failure" or "MTCF." In the mid-1980s, WRA began regularly

---

[3]As the district court explained:

> [A] standard first begins to be developed through the formation of a task force or group, which is a small group of members who work to develop an initial consensus and first draft of something and then move it forward. . . . After the completion of the task group's work, the proposed standard will move to the subcommittee level, where it is first officially balloted. There is a percentage affirmative requirement and any negative votes that are submitted must be considered by the originating subcommittee. From there, the proposed standard moves to the main committee, which can vary in size from 50 to over 1,000 members with every member receiving a ballot. There are percentage return requirements, i.e., a certain percentage of committee members must cast their ballots and a certain percentage must vote affirmatively. From there, all 22,000 members of ASTM working on technical committees have the opportunity to review the proposed standard and then it's reviewed by the 9-member Committee on Standards, which looks to see whether or not the process of ASTM has been followed and that the committee which developed the standard was balanced (i.e., that the committee was made up of individuals with diverse areas of expertise and divergent economic, business, etc. interests).

ASTM, 2005 WL 1941653, at *2 (internal citations omitted).

subcontracting with Corrpro for it to do the field work necessary for WRA to make its storage tank assessments. Most of the major oil companies retained WRA to implement Rogers' procedure so that the removal and replacement of existing USTs could be prioritized.

Nelson also invited Derick Sharp ("Sharp"), President of Armor Shield Corporation ("Armor Shield"), to attend the meeting. Armor Shield was in the business of providing equipment, materials, and installation services with respect to the interior linings of USTs, as well as manned-entry internal inspections of USTs. According to the defendants, at that time, given the lack of approved alternatives, Armor Shield enjoyed a "virtual de facto monopoly for UST assessments and upgrades." Appellees' br. at 6.[4]

Nelson's meeting resulted in the creation of an ASTM task group charged with developing a draft standard regarding alternative methods of assessing USTs. The task group's membership included Baach and Thomas Mehalick ("Mehalick"), who represented Corrpro; Rogers and William Jones ("Jones"), who represented WRA; Tony Rieck, who represented the National Leak Prevention Association; and Sharp and Hirsch Caudill ("Caudill"), who represented Armor Shield. The task group's work resulted in ASTM promulgating an emergency standard ("ES-40") in November 1994 that recognized, among other things, that Rogers' MTCF statistical method was a viable, non-invasive method for evaluating whether the use of cathodic protection could result in a successful upgrade of a UST. But because it was an emergency standard, ES-40 had a "life span" of only two years at which time it would expire. Not surprisingly, according to a finding the district court made, Sharp and Caudill were "adamantly opposed" to the creation of ES-40 and "frequently endeavored to disrupt and impede" the group's progress. ASTM, 2005 WL

_____

[4]Even if defendants overstate Armor Shield's position in the market, our result would not be different as it does not turn on this point. In any event, regardless of Armor Shield's market share, it is obvious that the adoption of a standard recognizing MTCF as a viable, non-evasive method for evaluating USTs was not in its interest.

7

1941653, at *4. Additionally, the court indicated that Sharp "frequently threatened to sue various individuals and companies on numerous occasions throughout the standard development process." Id. As will be seen these threats were not idle.

      D.      Creation of GS-148 and Armor Shield's Appeal to the ASTM's Committee on Standards

Sometime after the promulgation of ES-40, the G-01 (corrosion) committee assumed control over the development of a permanent standard. It also appears that ASTM's E-50 (environmental assessment committee) was involved in the development of the standards.[5] While Rogers did not serve on the G-01 committee, Sharp not only served on that committee but also opposed the drafting of a permanent standard based on ES-40. Notwithstanding Sharp's objections, in October 1998, the G-01 Committee and ASTM's entire membership voted to create a permanent standard that was designated G-158. Like ES-40, G-158 recognized MTCF as a viable, non-invasive method for evaluating whether a UST could be upgraded via cathodic protection. During the above process, ASTM neither restricted nor suspended Baach or Rogers from participating in the task group or the E-50 and G-01 committees, and similarly did not tell either Baach or Rogers that his activities were either unwelcome or improper.

Acting on behalf of Armor Shield, Sharp immediately appealed the decision to create the G-158 standard to ASTM's Committee on Standards ("COS") arguing, among other things, that ASTM members with a commercial stake in the creation of G-158 were overrepresented on the G-01 committee and that the process used in the creation of the permanent standard was inconsistent with ASTM's standard-setting procedures. Sharp further argued that the G-158 standard would have anti-competitive effects and violate antitrust laws. The COS denied

_____

[5]We are uncertain to what extent, if any, membership in the task group and the E-50 and G-01 committees differed.

Sharp's appeal, finding that the composition of the G-01 committee did not violate ASTM's condition of balance[6] and that the committee had followed both ASTM's procedural requirements as well as its criteria for due process.     Sharp appealed from the COS's decision to the Board, raising many of the same issues he had argued previously.  The Board, after hearing from Philip Schworer, Sharp's attorney, Victor Chaker, chairman of the G-01 committee, and James Bushman ("Bushman"), a member of the G-01 committee,[7] affirmed the COS's findings, concluding that G-158 had been developed properly.  Thereafter, the G-158 standard was officially adopted and released for publication.

E.     The Armor Shield Litigation

The dispute regarding the adoption of the ES-40 and G-158 standards reflected a highly technical struggle between proponents of different methods of upgrading USTs, setting the stage for litigation between them.  Sure enough, on November 12, 1998, less than a month after adoption of G-158 and its publication as a permanent standard, Armor Shield instituted an action charging antitrust violations in the United States District Court for the Northern District of Ohio (the "Armor Shield litigation").  Armor Shield named as defendants, among others, ASTM, Corrpro, Harco Technologies, Inc. (a Corrpro subsidiary), WRA, Baach, Rogers, and Bushman.  The suit, however, did not include Mehalick or Jones, or any other employees or representatives of Corrpro or WRA.  In its complaint, Armor Shield alleged, among other things, that the

[6]To be "balanced," a committee "could not be made up of more members who are or were affiliated with a commercial 'producer' than members who were classified as 'users' or 'general interest.'" ASTM, 2005 WL 1941653, at *4 n.1 (internal citation omitted).

[7]Bushman, for a time, also had served as Chairman of the E-50 (environmental assessment) committee and was one of Corrpro's co-founders. Bushman's affiliation with Corrpro ended in September 1993, when, pursuant to a negotiated severance agreement, he formally resigned as an officer, employee, and member of Corrpro's board of directors.

defendants had restrained trade by "conspiring with one another to manipulate and violate ASTM's regulations that all standards be developed through a rigorous and unbiased review process so as to promulgate the emergency ES-40 and G-158 permanent standards." ASTM, 2005 WL 1941653, at *4.

It is undisputed that the defendants strongly denied the allegations contained in Armor Shield's complaint and defended themselves vigorously in the action. Nonetheless, effective December 14, 2001, the parties settled the Armor Shield litigation, with the defendants paying Armor Shield $1.4 million. The settlement agreement did not apportion responsibility among the defendants, but Rogers and WRA contributed $50,000 to the total settlement and Baach and Corrpro contributed $1.225 million.[8] ASTM, 2005 WL 1941653, at *6 ("The settlement agreement did not specify how much of those amounts were attributable to Warren Rogers or Michael Baach individually or to separate the individual defendants from the corporate entities with which they were affiliated."). The settlement agreement provided for Armor Shield's complaint to be dismissed with prejudice, without any findings or admissions of wrongdoing by Baach, Rogers, or ASTM, or, for that matter, any of the defendants.

The defendants in the Armor Shield litigation, who are the defendants here as well, incurred substantial costs and expenses. Specifically, in addition to their contributions to the settlement, Rogers and WRA incurred $338,083.85 in attorney's fees, costs, and expenses. Ultimately, WRA paid the total amount on behalf of both itself and Rogers.[9] Similarly, in

---

[8]ASTM did not make a contribution towards the settlement. We note that the Rogers-WRA and Baach-Corrpro contributions do not equal $1.4 million, and thus conclude that other defendants in the underlying Armor Shield litigation, not involved in this litigation, must have contributed the balance.

[9]On March 28, 2002, Rogers and WRA's Board of Directors entered into a formal agreement whereby Rogers agreed to remit any monies he recovered from ASTM (pursuant to its indemnification provision) to WRA as reimbursement for the attorney's fees, costs, and

addition to paying their share of the settlement costs, Baach and Corrpro incurred $615,121.68 in attorney's fees, costs, and expenses. Of that amount, $80,408.61 was attributable to Baach alone, as he was represented in the litigation both jointly with Corrpro and individually. Although Corrpro advanced Baach's individual legal fees, National Union Fire Insurance Company of Pittsburgh ("National Union"), Corrpro's Director's and Officer's ("D&O") liability insurance carrier, reimbursed it for these expenses. Moreover, after the exclusion of a $150,000 deductible, National Union reimbursed Corrpro for 50% of the reasonable defense costs and expenses it paid to its own law firm. Ultimately, Corrpro incurred a total of over $300,000 in unreimbursed legal fees, costs, and expenses defending against the Armor Shield litigation.[10] Finally, in addition to making the above reimbursements, National Union paid $700,000 of the $1.225 million settlement, reducing Corrpro's net contribution to the settlement to $525,000.[11]

F.      Defendants' Requests for Indemnification

In or around May 1999, about six months after the Armor Shield litigation was initiated, defendants first requested that ASTM indemnify them for their reasonable attorney's fees, costs, and expenses as well as for any liability they might incur with respect to that litigation pursuant to ASTM Bylaw No. 10.1. But even earlier, ASTM President James Thomas, via letter

---

expenses related to the Armor Shield litigation that WRA had paid on his behalf.

[10]As Rogers had done with WRA, Baach entered into a formal agreement with Corrpro whereby he agreed to remit to Corrpro any monies he recovered from ASTM (pursuant to its indemnification provision) as reimbursement for the attorney's fees, costs, and expenses related to the Armor Shield litigation that Corrpro paid on his behalf. Neither Baach nor Corrpro, however, assumed any similar obligation to reimburse National Union.

[11]The district court, in an unchallenged determination, found that National Union paid $700,000 of the settlement which we note is one-half of the total settlement paid by all the defendants but more than one-half of what Corrpro paid.

11

dated December 2, 1998, had agreed that ASTM would reimburse Bushman for his reasonable attorney's fees and costs arising from the <u>Armor Shield</u> litigation "unless and until it becomes apparent to ASTM that Armor Shield's allegations concerning your conduct are supported by evidence. That is, until ASTM believes that you operated outside the auspices of the Society, in bad faith, or in a manner that was not in the best interests of the Society." J.A. at 982-83.

On August 26, 1999, ASTM's Executive Committee met via telephone conference call to consider what by then had become defendants' repeated requests for indemnification. At the time, "[i]t was the Committee's judgment, after thorough discussion, that it was not possible to say with assurance at this time that all of the requirements for the granting of indemnification contained in ASTM's by-laws (and in the Pennsylvania not-for-profit corporation law) had been met by any of the parties requesting indemnification . . . ." <u>ASTM</u>, 2005 WL 1941653, at *5 (internal quotations and citations omitted). Accordingly, the Executive Committee concluded it could not grant any of the defendants indemnification or, in the case of Bushman, continued indemnification. The Executive Committee made clear, however, that its judgment was not "final" but rather was subject to change depending upon additional information and developments in the case. Subsequently, the Board during a meeting held October 12-13, 1999, voted to approve the Executive Committee's denial of defendants' indemnification requests.[12]

---

[12]In its findings of fact, the district court observed that notwithstanding defendants' repeated offers "to present evidence, provide information or answer any questions that ASTM may have had regarding the allegations in the Armor Shield complaint . . . . ASTM gave the defendants no opportunity whatsoever to present any information or evidence to either the Board of Directors or the Executive Committee . . . ." <u>ASTM</u>, 2005 WL 1941653, at *5 (internal citations omitted). The court further observed that:

> In deciding that the defendants were not made parties to the Armor Shield suit by reason of the fact that they were serving on a committee operating under the auspices of

After the parties finalized the settlement in the <u>Armor</u> <u>Shield</u> litigation in 2002, defendants again requested that ASTM indemnify them for their settlement costs and attorney's fees and costs in that litigation. But neither the Board nor the Executive Committee took any action in response to defendants' renewed request for indemnification.

_____

the Society and that they were not acting in good faith and in a manner which they reasonably believed to be in, or not opposed to, the best interests of the Society, Plaintiff ASTM considered only the allegations contained in Armor Shield's complaint and amended complaint. ASTM undertook absolutely no investigation whatsoever to determine the veracity of those averments, despite the fact that it believed the allegations against it in the Armor Shield pleadings to be false and that it had voted to uphold the findings of its own Committee on Standards that its internal regulations and balance requirements had been followed by the E-50 and G-01 Committees in their development of the ES-40 and G-158 standards.

<u>Id.</u> (internal citations omitted).

The Board and Executive Committee were not, however, in the dark about the <u>Armor</u> <u>Shield</u> litigation. With respect to their knowledge of it, ASTM notes that in April 1999, Thomas O'Brien, ASTM's outside counsel, made a presentation to the entire Board summarizing the allegations in the <u>Armor</u> <u>Shield</u> litigation based on his review of the pleadings and outlining the legal and factual bases of the antitrust claims raised. O'Brien also explained the substance of a motion to dismiss that he had drafted on ASTM's behalf. Morris Brooke, ASTM's general counsel supplemented Brown's presentation with a white paper circulated to the Executive Committee that "'walked the [E]xecutive [C]ommittee members through an analysis and an understanding of the . . . not-for-profit laws of the state of Pennsylvania.'" Appellant's br. at 17 (quoting J.A. at 126). Finally, inasmuch as most members of the Executive Committee also were serving on the Board when Sharp filed his appeal regarding the creation of G-158, they were "familiar with the facts underlying the controversy . . . even prior to hearing the presentations and reviewing the materials prepared by counsel." <u>Id.</u>

13

G.    Procedural History

ASTM filed the complaint leading to this appeal against defendants in the district court on September 10, 2002.  In its complaint, ASTM sought a declaration that it was not required to indemnify defendants for attorney's fees and settlement costs arising from the Armor Shield litigation.  Defendants answered ASTM's complaint, asserting counterclaims predicated on breach of contract and promissory estoppel theories.  In their counterclaim defendants also sought a declaratory judgment based on ASTM Bylaw No. 10.1 ordering ASTM to indemnify them for their attorney's fees and settlement costs in the Armor Shield litigation.  Moreover, defendants sought indemnification for any attorney's fees they would incur in this action attempting to enforce their rights under Bylaw No. 10.1.

From January 4 to January 7, 2005, the district court conducted a bench trial on the parties' respective claims.  Thereafter, on August 12, 2005, the district court entered an order in which it found in favor of defendants, entering judgment against ASTM on defendants' counterclaim in the amount of $1,422,747.86, which sum included defendants' attorney's fees in the Armor Shield litigation.  The district court further ruled that the defendants were entitled to recover attorney's fees incurred in this action and ordered them to submit their bills for the fees within 20 days and gave ASTM 20 days thereafter to object to them.  The district court, however, never has fixed the fee award for this litigation.[13]  Id.  ASTM appeals from the August 10, 2005 order both with respect to the indemnification order for the Armor Shield litigation and the unquantified award of fees against it in this case.


III.  JURISDICTION AND STANDARD OF REVIEW

[13]On August 30, 2005, defendants filed a joint bill of attorney's fees and costs as well as a motion to file unredacted copies of materials relating to their attorney's fees under seal, which ASTM opposed.  On September 21, 2005, the district court stayed defendants' motion until such time as we issue our decision on ASTM's appeal.

The district court exercised jurisdiction pursuant to 28 U.S.C. § 1332. Though we initially questioned our jurisdiction, for the reasons we explain below, we have concluded that we have jurisdiction pursuant to 28 U.S.C. § 1291.

We review a district court's findings of fact following a bench trial under the clearly erroneous standard. Gordon v. Lewistown Hosp., 423 F.3d 184, 201 (3d Cir. 2005); Fed. R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."). By contrast, "[w]e have plenary review over a district court's conclusions of law." Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004) (internal quotations and citation omitted). We similarly exercise plenary review "over a district court's choice and interpretation of legal precepts." Blasband v. Rales, 971 F.2d 1034, 1040 (3d Cir. 1992). We apply this standard regardless of whether the district court has relied on federal or state law. Id. In this case, the parties are in agreement that Pennsylvania law governs the indemnification issues. Therefore, we are deciding this case the way that we believe that the Supreme Court of Pennsylvania would decide it except, of course, that we determine whether we have jurisdiction by applying principles of federal law.

IV. DISCUSSION

A. Jurisdiction over ASTM's appeal

Preliminarily, we address the threshold question of whether we have jurisdiction over this appeal. See Am. Motorists Ins. Co. v. Levolor Lorentzen, Inc., 879 F.2d 1165, 1169 (3d Cir. 1989) (noting "we have the responsibility to satisfy ourselves of our jurisdiction"); Thermice Corp. v. Vistron Corp., 832 F.2d 248, 251 (3d Cir. 1987). Because we questioned our jurisdiction, we directed the parties to provide letter briefs addressing whether the district court's failure to quantify its award of attorney's fees in this action, as distinguished from in

15

the underlying <u>Armor</u> <u>Shield</u> litigation, precludes us from exercising jurisdiction. We asked for these briefs by reason of our opinion in <u>Beckwith Machinery Co. v. Travelers Indemnity Co.</u>, 815 F.2d 286 (3d Cir. 1987), dealing with our jurisdiction over an appeal of an attorney's fees award before the district court had determined its amount. The parties have filed these briefs agreeing that we have jurisdiction over this entire appeal, and we agree with them that we have jurisdiction but only to a limited extent.

Surprisingly, <u>Beckwith</u> was our first case addressing the question of whether a district court order awarding, but not yet quantifying, attorney's fees is a final order from which an appeal may be taken when the fee award results from the underlying cause of action, rather than as a collateral matter. In <u>Beckwith</u>, the plaintiff stated a claim for breach of contract against the defendant insurer based on the insurer's decision to withdraw its defense of the plaintiff in an underlying action. After finding in the plaintiff's favor, the district court entered judgment on his behalf for, among other things, his attorney's fees and costs in the underlying action. The district court similarly awarded the plaintiff attorney's fees and costs for the breach of contract litigation against the insurer, <u>i.e.</u>, in the case before it. Notably, however, the district court did not quantify either of these awards.

On the insurer's subsequent appeal, after outlining the relevant case law, we ruled that "when the award of attorney's fees arises out of and is part of the claimant's cause of action and is not separately authorized by a statute providing for such an award, an order does not become final until the attorney's fees are quantified." <u>Id</u>. at 290. We further observed that, although not at issue, to the extent the district court similarly had not quantified the attorney's fee award for the breach of contract litigation against the insurer, it "should be regarded no differently than the award of attorney's fees in the [underlying] litigation inasmuch as both were incurred as a direct consequence and result of [defendant's] breach of the insurance contract, and both constitute a part of the damages due [plaintiff]." <u>Id.</u> at 292. Thus, we dismissed the insurer's appeal in <u>Beckwith</u>.

16

But the Supreme Court's decision in <u>Budinich v. Becton Dickinson & Co.</u>, 486 U.S. 196, 108 S.Ct. 1717 (1988), promptly cast doubt on the latter observation. In <u>Budinich</u>, the court entered judgment for the plaintiff in an employment compensation action on a jury verdict for an amount considerably less than he had sought. The plaintiff filed timely new trial motions as well as a motion for attorney's fees. The district court subsequently denied the new trial motions on May 14, 1984, but found that the plaintiff was entitled to attorney's fees, though it did not then fix the fee award. Subsequently, however, the district court entered a final order on August 1, 1984, determining the amount of those fees. Thereafter, the plaintiff appealed from the district court's post-trial orders in their entirety. Although affirming the attorney's fees award, the Court of Appeals for the Tenth Circuit granted defendant's motion to dismiss the appeal as to all other issues on the ground that the judgment was final and immediately appealable upon entry of the May 14, 1984 order, and the plaintiff's appeal was not timely because the plaintiff did not file it within 30 days of that order.

In ensuing proceedings, the Supreme Court affirmed, finding that "[a]s a general matter, at least, we think it indisputable that a claim for attorney's fees is not part of the merits of the action to which the fees pertain. Such an award does not remedy the injury giving rise to the action, and indeed is often available to the party defending against the action."[14] <u>Budinich</u>, 486 U.S. at 200, 108 S.Ct. at 1721. The Court added, "[c]ourts and litigants are best served by the bright-line rule, which accords with traditional understanding, that a decision on the merits is a 'final decision' for purposes of § 1291 whether or not there remains for adjudication a request for attorney's fees attributable to the case." <u>Id.</u> at 202-03, 108 S.Ct. at 1722.

Since the Supreme Court's ruling in <u>Budinich</u>, we have

[14]On appeal, the Supreme Court framed the question presented as follows: "[W]hether a decision on the merits is a 'final decision' as a matter of federal law under § 1291 when the recoverability or amount of attorney's fees for the litigation remains to be determined." <u>Budinich</u>, 486 U.S. at 199, 108 S.Ct. at 1720.

on several occasions applied its rationale, starting with <u>Frangos v. Doering Equipment Corp.</u>, 860 F.2d 70 (3d Cir. 1988).  In <u>Frangos</u>, defendants Doering Equipment ("Doering") and Logan Equipment ("Logan") settled a suit filed by a worker who had been injured in a fall from a manlift.  Thereafter, Doering and Logan pursued a claim for indemnity or contribution against Parker-Hannifin Corporation ("Parker"), a named defendant in the underlying suit.  Although the district court granted Parker's motion for a directed verdict as to some of Doering's and Logan's claims at the close of their case, Doering and Logan ultimately obtained a jury verdict in the amount of $52,000 on the remaining claims.  Parker subsequently filed a motion for a judgment notwithstanding the verdict and for a new trial while, still later, Doering and Logan filed a petition for attorney's fees.  The court dismissed Parker's post-trial motions, but concluded Doering and Logan were entitled to attorney's fees, albeit to the extent they related only to their defense in the underlying action.  Parker then appealed.

Significantly, at the time of the appeal the district court had not yet determined the fees to which Doering and Logan were entitled.  Although Doering and Logan argued that the court's "failure to quantify attorneys' fees render[ed] all aspects of the case unappealable," <u>Frangos</u>, 860 F.2d at 72, we disagreed, citing <u>Budinich</u> for the proposition that "a decision on the merits is a 'final decision' as a matter of federal law under § 1291 [even] when the recoverability or amount of attorney's fees for the litigation remains to be determined."  <u>Id.</u> (internal quotations and citation omitted).  Accordingly, we found that although that portion of the appeal dealing with Doering's and Logan's attorney's fees must be dismissed, we nonetheless had jurisdiction over the appeal from the underlying judgment.  <u>Id.</u>

The next case in which we dealt with a similar appealability issue at length was <u>Vargas v. Hudson County Board of Elections</u>, 949 F.2d 665 (3d Cir. 1991).  In <u>Vargas</u>, a plaintiff class filed a complaint against Gerald McCann, a candidate for mayor, and members of his campaign staff (the "McCann defendants"), among others, alleging that the McCann defendants had engaged in a conspiracy to prevent them from voting in a mayoral election.  After the National Union Fire

18

Insurance Company ("National Union") refused to defend or indemnify the McCann defendants, they joined National Union as a third-party defendant to the litigation. The district court subsequently granted summary judgment against National Union, declaring it owed coverage to the McCann defendants. Soon thereafter, the McCann defendants settled the class action. On April 24, 1990, the district court, finding the settlement to be in good faith, directed National Union to indemnify the McCann defendants for both the settlement amounts and "any attorneys' fees award which may be made in favor of [class] plaintiffs and/or plaintiffs' attorneys against the [McCann] defendants." Vargas, 949 F.2d at 667 (internal quotations omitted). Additionally, the district court ordered National Union to reimburse the McCann defendants for their own attorney's fees. Finally, on December 13, 1990, the district court entered an attorney's fees and expense award in favor of the plaintiff class (i.e., fixed the attorney's fees and expenses due the class plaintiffs).

Approximately one month later, on January 11, 1991, National Union filed its notice of appeal, which the McCann defendants and class plaintiffs moved to dismiss on timeliness grounds as to all orders other than that of December 13, 1990. We denied the motion as we concluded that there had not been an appealable order until the district court quantified the amount of attorney's fees which the McCann defendants owed the plaintiffs (and thus for which National Union was liable). In reaching the result we explained:

> The monetary claim presented by the McCann defendants in this case against National Union consisted of two elements-the damages that they were required to pay the class plaintiffs and the attorneys' fees that the McCann defendants were required to pay the class plaintiffs. The McCann defendants['] total obligation to the class plaintiffs, and hence their total claim for damages against National Union, was not determined until the amount of the class action counsel fees had been set.

19

Id. at 670. Additionally, we noted it was "critical to recognize that the relevant claim for fees here was not that made by the McCann defendants pursuant to state statute to recover for representation in this case against National Union" which was, by contrast, "clearly" a Budinich claim. Id. at 669 ("Essentially, Budinich concluded that an award of counsel fees to the prevailing party is not a part of the judgment, but rather is due because of the judgment.").

Following Vargas, we again addressed the attorney's fees finality issue in Ragan v. Tri-County Excavating, Inc., 62 F.3d 501 (3d Cir. 1995). There, defendant-appellant Hartford Fire Insurance Co. ("Hartford") served as the surety on a labor and material payment bond purchased by Mele Construction Co., Inc. ("Mele"). Hartford's bond required prospective claimants not in "direct contract" with Mele to give written notice of their claims to Hartford within 90 days after they ceased work. Plaintiffs-appellees, the International Union of Operating Engineers, Local 542 and Michael J. Ragan, its administrator of "fringe benefit" funds (together, "Local 542"), had a collective bargaining agreement with and did work for Tri-County Excavating, Inc. ("Tri-County"), a corporation that three daughters of John Mele, president of Mele, owned, on a job for Mele. Hartford subsequently rejected a claim for fringe benefits Local 542 made 120 days after it ceased work because Local 542 was not in "direct contract" with Mele, and thus Hartford's bond required Local 542 to give notice of its claim within 90 days of the last labor performed.

Local 542 then sued Tri-County and Hartford. Following a bench trial, the district court rejected Hartford's untimeliness argument, and entered judgment in favor of Local 542. In so doing, the district court awarded Local 542 its reasonable attorney's fees, although it did not quantify their amount until nearly a year later. On Hartford's subsequent appeal, taken before the district court quantified the fees, when addressing the basis for our jurisdiction, we noted that the district court premised its fee award on a provision in the agreement between Local 542 and Tri-County. Accordingly, we ruled, "[b]ecause the attorney fees awarded in this case were part of the contractual damages sought by Local 542, the district court's

20

delay in quantifying the amount of such fees until February 13, 1995 rendered the earlier order non-final for purposes of appeal."[15]  Ragan, 62 F.3d at 505.

Most recently we attempted to reconcile Budinich and Ragan in Gleason v. Norwest Mortgage, Inc., 243 F.3d 130 (3d Cir. 2001).  In Gleason, the litigants stipulated to a final judgment order under Federal Rule of Civil Procedure 54(b), where the district court stated that all claims were resolved through judgment, settlement, or mootness, except that each party's claim for contractual attorney's fees and costs remained outstanding.  Citing to Budinich, we first acknowledged that "[w]hen an outstanding claim for attorneys' fees is by a statutory prevailing party, the unresolved issue of those fees does not prevent judgment on the merits from being final."  Gleason, 243 F.3d at 137.  Citing to Ragan, however, we added that "when attorneys' fees are part of the contractual damages at issue on the merits, a District Court's order delaying quantifying the amount of such fees is non-final for purposes of appeal."  Id.  Noting the claim for attorney's fees in Gleason was predicated not on a statutory prevailing party provision but on a contractual obligation to pay attorney's fees "to the prevailing party in whose favor judgment is entered," we found "[f]or all practical purposes" there was "no difference under these circumstances, for § 1291 finality purposes, between payment of attorneys' fees to a prevailing party under statute and payment of attorneys' fees under the contract to a 'prevailing party.'"  Id. at 137-38.  Accordingly, we concluded, given the attorney's fees provided for were "not an integral part of the contractual relief sought[,] the issue of which party prevailed in the litigation on the merits is collateral to the substantive issues on appeal and does not prevent judgment on the merits from being final."  Id. at 138.

Applying the foregoing precedents to this appeal, we conclude that we have jurisdiction over the appeal insofar as it is from the order providing for defendants' indemnification for

---

[15]The earlier order became final when the court entered the February 13, 1995 order.  Consequently, we then had jurisdiction over the appeal from the earlier order.  Ragan, 62 F.3d at 505-06.

21

settlement costs and attorney's fees incurred in the Armor Shield litigation, sums that the district court has quantified. It is true that, like the plaintiffs in Ragan, defendants included their request for attorney's fees with respect to this indemnification litigation in their respective answers to ASTM's complaint, citing ASTM Bylaw No. 10.1 in support of their request. Notably, however, inasmuch as this request was expressly "not an integral part of the contractual relief sought, the issue of which party prevailed in the litigation on the merits is collateral to the substantive issues on appeal and does not prevent judgment on the merits from being final." Gleason, 243 F.3d at 138. Put another way, the substantive issues on appeal plainly center on defendants' request for indemnification in the Armor Shield litigation, rather than on their request for attorney's fees with respect to enforcing ASTM's indemnification obligations in this litigation as it pertains to that litigation. See Vargas, 949 F.2d at 670 (finding "[t]he McCann defendants['] total obligation to the class plaintiffs, and hence their total claim for damages against National Union, was not determined until the amount of the class action counsel fees had been set.").

Accordingly, we have jurisdiction over this appeal to the extent that it relates to defendants' indemnification request for settlement costs and attorney's fees in the Armor Shield litigation, but, for the reasons outlined above and for the reasons we discuss in section IVG, infra, relating to pendent jurisdiction, we do not have jurisdiction over this appeal to the extent that it relates to the unquantified attorney's fees in this litigation. Therefore, we will entertain the appeal on the merits with respect to defendants' indemnification request for settlement costs and attorney's fees in the Armor Shield litigation, but will dismiss the appeal to the extent that it relates to attorney's fees and costs in this litigation.

B.      Business judgment rule

We now reach the merits of this appeal and first consider application of the business judgment rule. In this regard, ASTM claims that the district court incorrectly rejected its argument that the Board's decision not to indemnify Baach and Rogers was protected under that rule as adopted by the Supreme Court

22

of Pennsylvania.

Even though the parties have briefed and argued this case on their understanding that the business judgment rule could be a defense here to the counterclaim for indemnification, we question whether this case implicates the business judgment rule in the first instance. ASTM, as it had every right to do, initiated this litigation as a declaratory judgment action and thereby reversed the usual order of the parties when there is a dispute over the payment of money, for in such a case the claimant usually is the plaintiff. But the unusual procedure posture of this case should not change the governing law. Thus, we believe that essentially, particularly in the light of defendants' counterclaim, this case involves an action by the defendants to recover money from the plaintiff. Therefore, the defendants should be regarded as being in the same position as an ordinary trade creditor seeking to recover on a contract for the delivery of goods. In such a case, as, for example, a case in which the purchaser-defendant has refused to pay the creditor-plaintiff for goods the latter delivered on grounds that they were defective, the defendant surely could not invoke the business judgment rule in opposition to the creditor's claim and assert that its good faith conclusion that the delivered goods were defective should protect it from liability. Rather, if the suitability of the goods is in dispute, the court entertaining the case would determine whether the goods complied with the applicable specifications in a process that would not implicate the business judgment rule.

In this regard, we point out that ASTM Bylaw No. 10.1, which is the foundation for defendants' claim, is mandatory and provides that, when the bylaw is implicated, the protected person "shall be indemnified by" ASTM. While it is true that the bylaw three times uses the word "reasonably" or "reasonable," it does so when referring to amounts an indemnitee expended, to the indemnitee's belief that he was acting in the best interests of ASTM, and to his belief that his conduct was lawful. Thus, the bylaw does not suggest that merely because ASTM "reasonably" challenges the reasonableness of an indemnitee's actions or expenditures, the business judgment rule will protect it from liability.

23

In making our observation that the parties may have taken this litigation off track by focusing on the business judgment rule, we reiterate that, in reality, ASTM, i.e., the corporate-indemnitor, should be regarded as the actual defendant in this case because it is ASTM against whom a monetary judgment has been sought. Accordingly, after we reverse the order of the parties, it becomes apparent that we are not dealing with the usual situation in which officers or directors seek to insulate themselves from liability from a claim or from a direction by a court by invoking the business judgment rule. Thus, this litigation differs from that in Cuker v. Mikalauskas, 692 A.2d 1042 (Pa. 1997), the case in which the Pennsylvania Supreme Court first explicitly recognized the business judgment rule. There, the court indicated that "[t]he issue is whether the business judgment rule permits the board of directors of a Pennsylvania corporation to terminate derivative lawsuits brought by minority shareholders." Id. at 1045. The court went on to say that "[t]he business judgment rule should insulate officers and directors from judicial intervention in the absence of fraud or self-dealing," id. at 1048, and then explained when they would be insulated.

Finally, we point out that the district court initiated the discussion portion of its opinion by indicating that "[g]enerally speaking, under the law of Pennsylvania, construction of an indemnity contract is a question of law for the court to decide . . . ." ASTM, 2005 WL 1941653, at *7. It went on to hold that Rogers and Baach satisfied the indemnification criteria. Only then did it point out that "ASTM argues that even if it may have erred in denying the defendants' indemnification claims, its Board of Directors' decision should be upheld as it is protected from Court scrutiny by Pennsylvania's Business Judgment Rule." Id. at *11. But we are at a loss to see why, if ASTM erred, the business judgment rule should protect it, the corporate-indemnitor, as distinguished from its officers and directors who are not parties to this litigation, from liability. Nevertheless, notwithstanding our reservations regarding the applicability of the business judgment rule in this case, we will decide the case as the parties treated it in the district court and have treated it here, i.e., the application of the business judgment rule is an issue in this case and the rule could be a defense to defendants'

24

indemnification claims.

As we have indicated, Pennsylvania first explicitly recognized the business judgment rule in Cuker v. Mikalauskas, 692 A.2d 1042. The Cuker court indicated that the business judgment rule is a rule of law that "insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation." Id. at 1045. As such, the rule "reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance." Id. at 1046. In determining whether a business decision should be insulated from review, the court considers the following factors:

> whether the board or its special litigation committee was disinterested, whether it was assisted by counsel, whether it prepared a written report, whether it was independent, whether it conducted an adequate investigation, and whether it rationally believed its decision was in the best interests of the corporation (i.e., acted in good faith). If all of these criteria are satisfied, the business judgment rule applies and the court should dismiss the action.

Id. at 1048. Thus, where the business judgment rule applies, it prohibits the court from examining the merits of the underlying business decision.

Here, the district court's determination that ASTM's decision to deny Baach's and Rogers' requests for indemnification did not merit protection under the business judgment rule hinged on its finding as to the adequacy of ASTM's investigation. On this point, the district court

25

explained:

> [A]s all of the various members of the Board called as witnesses in this case, and as ASTM's former General Counsel and President both testified, neither they nor anyone else acting on ASTM's behalf conducted any investigation whatsoever into the veracity of the allegations against Defendants. Rather, the only evidence which they had before them at the time they made their decision to not indemnify was the Armor Shield complaint. Although Defendants repeatedly offered to provide whatever evidence the ASTM Board deemed necessary and repeatedly sought to be heard by the full Board on the issue of indemnification, ASTM never responded to any of the defendants' offers or requests. It is the opinion of this Court that this does not constitute reasonable diligence on the part of the ASTM Board.

ASTM, 2005 WL 1941653, at *11.

ASTM protests that "the information before the Board (which included the advice of ASTM's general counsel, outside counsel and an ASTM officer)" provided a sufficient basis for the Board's decision and the district court unfairly faulted the Board "for not conducting a detailed investigation, which apparently would have required that the Board personally review all material relating to the litigation and hold a hearing during a Board meeting." Appellant's br. at 25. To be sure, "[r]eliance on reports, representations, statements, and opinions prepared by officers and employees of the corporation and by outside professionals and experts will often be necessary and will, in many situations, satisfy the informational requirement . . . ." 1 American Law Institute ("ALI") Principles of Corporate Governance: Analysis and Recommendations, § 4.01(c),

26

comment e (1994).[16]  Here, however, ASTM refused to reveal the content of those "reports, representations, statements, and opinions" prepared by counsel for purposes of its discussions with the Executive Committee and Board regarding Baach's and Rogers' respective requests for indemnification.  Indeed, it was for this reason that the district court admonished an ASTM witness at trial who sought to discuss counsel's role in the discussions, stating "Don't use advice of counsel as a defense because it's not a defense here."  J.A. at 215.  Relatedly, and not surprisingly, defendants argue that ASTM "cannot now rely upon such advice in order to claim that the Board conducted a reasonable investigation."  Appellees' br. at 31.

Unfortunately, the cases cited by the parties do not provide much illumination as to whether the Pennsylvania courts would require a nonprofit corporation in the position of ASTM to disclose the advice that counsel gave its members to receive protection under the business judgment rule.  But even assuming the validity of ASTM's position that it did not have to disclose that information, several factors serve to bolster the district court's finding that application of the business judgment rule does not insulate ASTM from liability in this case.  First, it is undisputed that no one at ASTM consented to speak with either Baach or Rogers regarding their indemnification requests, notwithstanding their repeated offers to engage in such conversations.  Second, it is similarly undisputed that no one at ASTM (and no one acting on its behalf) conducted any investigation into the veracity of the allegations levied in the Armor Shield complaint.  To this end, it again bears noting that ASTM itself approved both the process pursuant to which the ES-40 and G-158 standards were promulgated as well as the substance of the standards.  Additionally, ASTM never restricted or suspended either Baach or Rogers from participating in any relevant standard-setting activities.  We believe that these circumstances support a finding that ASTM failed to act in good

_____

[16]The Pennsylvania Supreme Court in Cuker pointed out that the ALI Principles pertaining to the business judgment rule were similar to but not identical with Pennsylvania statutory law.  See Cuker, 692 A.2d at 1049 n.3.

faith, see Cuker, 692 A.2d at 1048, as well as the district court's conclusion that ASTM failed to exercise "reasonable diligence in deciding defendants should not be indemnified."[17] ASTM, 2005 WL 1941653, at *11. Accordingly, we decline to apply the business judgment rule so as to reverse the district court's indemnification order challenged on this appeal.[18]

## C. Indemnification for intentional acts

ASTM next argues that inasmuch as Armor Shield sued

---

[17]We note that ASTM additionally has advanced the "public policy" argument that if we allow the district court's decision to stand, our decision will have a "chilling" effect insofar as it fails to show "any deference to board decision-making unless arduous procedures are followed." Appellant's br. at 32. The contention is without merit. The district court's decision merely requires that an "adequate investigation" be conducted as that term has been interpreted in the case law – nothing more.

[18]We point out that it appears that if ASTM had wanted to do so it could have vested its officers or directors with power to exercise the type of discretion that the business judgment rule is intended to protect. In this regard, we observe that 15 Pa. Cons. Stat. Ann. § 5741 is not mandatory. Thus, rather than requiring a nonprofit corporation to indemnify the protected persons, it merely gives the corporation the "power" to do so, but limits the power to corporations not "otherwise restricted in [their] bylaws." Thus, ASTM did not have an obligation to adopt Bylaw No. 10.1 or its equivalent. Accordingly, it follows that ASTM could have adopted a bylaw reserving discretion in itself to determine whether in a particular case it would indemnify a person seeking indemnification. But it eschewed that approach and instead used the mandatory words that a person protected "shall be indemnified" in the circumstances the bylaw sets forth. We can understand why ASTM took that approach as it encourages persons to participate in its activities. Moreover, ASTM had a particular reason to take the mandatory obligation approach as its members serve in standard-setting activities without pay or other compensation and might be unwilling to do so without protection against liability for their activities. Nevertheless, in view of the fact that ASTM adopted the mandatory right to indemnification approach, it is difficult to understand how it can abandon that approach retroactively by reliance on the business judgment rule when a protected person seeks to be indemnified.

Baach and Rogers for alleged violations of Sections 1 and 2 of the Sherman Act and analogous state antitrust statutes, violations of the Lanham Act, and unfair competition, the district court's holding violates the "fundamental public policy of Pennsylvania" that parties may not contract away liability resulting from their intentional acts.  In sum, ASTM essentially contends that it "lacked the power" to indemnify defendants "even if [it] wanted to."  Appellant's br. at 35.  Defendants respond that there is no evidence that either Rogers or Baach engaged in any intentional wrongdoing and thus ASTM's argument is without merit.  Defendants are correct.

Preliminarily, however, before reaching the substance of the intentional acts issue, we address defendants' contention that ASTM waived this argument by failing to assert it in the district court.  See Ark-Tenn Distrib. Corp. v. Breidt, 209 F.2d 359, 360-61 (3d Cir. 1954) (noting when an issue is "raised by the pleadings, but not pressed at trial, in the absence of unusual circumstances, the ends of justice requiring it, [it] will not serve as a basis for the appellate tribunal to reverse the trial court").  On this procedural point, defendants are mistaken.  Specifically, in its proposed Post-Trial Findings of Fact and Conclusions of Law filed in the district court, ASTM pressed the very same argument it asserts here regarding indemnification for intentional acts.  Accordingly, ASTM did not waive its intentional acts argument.

Turning to the merits, we reject ASTM's position.  According to ASTM, "[t]here are numerous cases in Pennsylvania and federal courts sitting in Pennsylvania holding that public policy precludes indemnification clauses from covering intentional or wrongful conduct of the indemnitee." Appellant's br. at 34 (quoting Mahon v. City of Bethlehem, 898 F. Supp. 310, 314 (E.D. Pa. 1995)).  But the majority of the cases ASTM cites discuss indemnification in the context of insurance law, as distinguished from the law relating to nonprofit corporations.  See, e.g., Brown v. Creative Collections, Inc., No. Civ. A. 01-2809, 2002 WL 32345937 (E.D. Pa. June 10, 2002); State Farm Fire & Cas. Co. v. Dalrymple, 153 F. Supp. 2d 624 (E.D. Pa. 2001); Allstate Ins. Co. v. Fischer, No. 97-4806, 1998 WL 205693 (E.D. Pa. Apr. 28, 1998).  In this sense, they are all

29

arguably inapposite.[19]  Further, even assuming these cases are on point, the policy consideration driving their respective holdings – namely, that individuals not receive indemnification "against the consequences of [their] willful, criminal [i.e., intentional]" acts, see Esmond v. Liscio, 224 A.2d 793, 798 (Pa. Super. Ct. 1966) – is captured fully by that section of Pennsylvania's nonprofit corporations law (as echoed by ASTM Bylaw No. 10) prohibiting indemnification unless a claimant "acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the corporation."  See 15 Pa. Cons. Stat. Ann. § 5741; see also appellant's br. at 35 (noting that Pennsylvania's Nonprofit Corporations Law and ASTM Bylaw No. 10.1 are consistent with "Pennsylvania's strong policy prohibiting indemnification for intentional acts," and section 5741 "prohibits payment of indemnification benefits to individuals who did not act in 'good faith'").

In this case, by contrast, the settlement agreement reached in the Armor Shield litigation expressly provides it "does not constitute an admission of liability or responsibility . . . or an admission of the truth or validity of any allegations or claims made by any party in the Lawsuit, it being agreed that the aforesaid specifically deny the truth and validity of all allegations or claims made against them."[20]  J.A. at 1460-61; see

---

[19]In making this point, we fully are aware of ASTM's contention that, in determining a claimant's contractual right to indemnity, some district courts have found it appropriate to analogize that claim to those in cases dealing with an insured's right to insurance coverage.  See Mahon v. City of Bethlehem, 902 F. Supp. 76, 78 (E.D. Pa. 1995).

[20]This case differs from St. Paul Ins. Cos. v. Talladega Nursing Home, Inc., 606 F.2d 631 (5th Cir. 1979), which ASTM cites in support of the proposition that mere allegations of anticompetitive acts against the defendants, regardless of their actual intent, provide sufficient grounds upon which to deny defendants' request for indemnification given Pennsylvania's policy prohibiting individuals from contracting away liability resulting from their own intentional torts.  In Pennsylvania, as elsewhere, an insurer's duty to defend is measured by a claimant's pleadings.  Pac. Indem. Co. v. Linn, 766 F.3d 754, 760 (3d Cir. 1985).  Accordingly, if there is no possibility that the facts alleged, if true, could fall under the policy's scope of coverage, as is the usual

<u>also</u> 15 Pa. Cons. Stat. § 5741 (stating "[t]he termination of any action or proceeding by . . . settlement . . . shall not of itself create a presumption that the person did not act in good faith and in a manner that he reasonably believed to be in, or not opposed to, the best interests of the corporation . . . ."). Further, the district court expressly found that:

> While it is true that the Armor Shield complaint also accused the defendants of willful misconduct, there is simply no evidence that those accusations were true or that the defendants acted in any manner other than in good faith and in a manner which they reasonably believed to be in the best interests of the Society. ASTM, through its Committee on Standards and its Committee on Technical Committee Operations, essentially made just such a finding when it heard and subsequently

---

case when an intentional tort is at issue, the insurer has no duty to defend the insured. <u>Id.</u> (citing <u>Terra Nova Ins. Co. v. 900 Bar, Inc.</u>, 887 F.2d 1213, 1216 (3d Cir. 1989)). So it was in <u>St. Paul Insurance Cos.</u>, where the Court of Appeals for the Fifth Circuit affirmed the district court's decision that plaintiff insurers had no duty to defend, in part because the allegations of the underlying complaint constituted intentional wrongs. 606 F.3d at 633-34 (applying Alabama law). This case, however, is plainly in a different procedural posture inasmuch as the underlying action (<u>i.e.</u>, the <u>Armor Shield</u> litigation) was settled prior to defendants' final demands for indemnification. As such, what instead appears to be required is a determination of whether defendants acted in "good faith." Here, the district court made an affirmative determination on that issue.

ASTM attempts to refute this conclusion by relying on <u>Allstate Insurance Co.</u>, 1998 WL 205693, for the proposition that "where the underlying litigation either has settled or has not yet gone to judgment, the court need only look to the facts alleged in the underlying complaint . . . to determine whether indemnification is appropriate." Appellant's br. at 39. In <u>Allstate Insurance Co.</u>, however, an arbitrator expressly ruled against the insured; it was on that basis that plaintiff insurer filed its declaratory judgment action seeking an order that it had no duty to defend. 1998 WL 205693, at *1. Thus, inasmuch as neither Baach nor Rogers ever has admitted liability in this or in the underlying litigation, <u>Allstate Insurance Co.</u> is factually distinguishable.

31

> denied Derek Sharp's appeal of the standard in
> September, 1998.

ASTM, 2005 WL 1941653, at *10.  Given the above, we cannot say the district court's holding violates Pennsylvania's policy that parties not be allowed to contract away liability resulting from their intentional acts.

We also point out that if we accepted ASTM's argument, we would establish an unfortunate precedent discouraging, rather than encouraging the settlement of litigation.  It is, of course, fundamental that courts should encourage parties to litigation to settle their cases.  Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1314 n.16 (3d Cir. 1993); Walton v. Avco Corp., 610 A.2d 454, 461 (Pa. 1992).  But the practical consequence of ASTM's argument, if accepted, would be to make a defendant with an indemnification claim reluctant to settle a case against him if the complaint in that case alleged that he had engaged in intentional wrongful conduct because, by doing so, he would be waiving his indemnification rights.  While we do not suggest that a defendant necessarily may ensure that he will have an enforceable indemnification claim by settling an action against him charging him with intentional misconduct, inasmuch as the Armor Shield litigation did not establish that defendants engaged in such misconduct, if ASTM wanted to defeat their claim for indemnification, it should have presented evidence that they had done so.  Yet it never did.

On this point, we reiterate that ASTM Bylaw No. 10.1 provides that the scope of ASTM's obligation for indemnification includes "amounts paid in settlement," and we add that it does so without any exclusion for settlement of claims asserting that the indemnitees intentionally acted in a wrongful way.  Moreover, in authorizing a nonprofit corporation to indemnify certain persons for their expenses, 15 Pa. Cons. Stat. Ann. § 5741 includes "amounts paid in settlement," without exclusion of payment for expenses in litigation charging the indemnitee with intentional wrongful acts.  Thus, ASTM surely is wrong when it claims that Pennsylvania law precludes it from indemnifying the defendants for their costs and expenses in the Armor Shield litigation.

32

D.  Whether defendants were sued "by reason of" their service on ASTM committees

In addition to its business judgment and intentional acts arguments, ASTM contends that inasmuch as indemnification is available only to those persons who were or are parties to any threatened, pending, or completed litigation by reason of their service on an ASTM committee, the district court erred in summarily determining the "by reason of" condition in Bylaw No. 10.1 was satisfied. We reject this contention as we, like the district court, find that the evidence establishes that the "by reason of" condition was satisfied.

In support of its argument, ASTM asserts that under either a proximate or "but for" causation standard, the district court "was required to conclude that but for the participation of Rogers and Baach on ASTM committees, Armor Shield and its co-plaintiffs lacked viable grounds for a lawsuit against Rogers and Baach." Appellant's br. at 43. We believe that ASTM overstates defendants' burden here. Rather, we are satisfied that the "by reason of" language on which ASTM relies requires nothing more than there be a showing of a nexus between an indemnitee's activity and the matter for which indemnification is being sought. See Witco Corp. v. Beekhuis, 38 F.3d 682, 692-93 (3d Cir. 1994) (applying Delaware law); In re Miller, 290 F.3d 263, 267 (5th Cir. 2002) (same). But even if we accepted ASTM's formulation of the law regarding the nexus required, the district court made the finding that ASTM says is required. Specifically, the court concluded:

Dr. Rogers and Mr. Baach were clearly sued by Armor Shield and its co-plaintiffs solely because of their involvement in the ASTM standard setting process and their service on the E-50 and G-01 Committees. To be sure, the gravamen of Armor Shield's complaint is that by their service on the ASTM committees, the defendants manipulated the development and promulgation of the ES-40 and G-158 standards to violate Sections 1 and 2 of the Sherman Act, Section 43 of the Lanham Act and various other provisions of Ohio state law.

33

ASTM, 2005 WL 1941653, at *10.

We recognize that, as ASTM contends, some of the allegations in the Armor Shield complaint "describe conduct that simply has nothing to do with ASTM's standard-setting process." Appellant's br. at 43. But a plain reading of the factual allegations contained in the complaint evidences that Armor Shield predicated most of its claims on the promulgation of the ES-40 and G-158 standards in the absence of which Armor Shield would not have initiated its litigation. In this regard, it bears noting that Armor Shield did not initiate its litigation until after ASTM adopted the ES-40 and G-158 standards and denied Sharp's appeals attempting to preclude their adoption and publication. This order of events hardly is immaterial.

ASTM asserts as well that the district court "committed a second legal error by presuming . . . that Rogers and Baach satisfied the 'by reason of' requirement where the purpose of their unlawful actions, as alleged in the Armor Shield Complaint, was not to benefit the indemnitor, ASTM, but rather to advance the goals of their private employers at ASTM's expense."[21] Appellant's br. at 45. Defendants respond that the contention is devoid of evidentiary support. Again, we hold defendants are correct. Initially, as discussed supra, there is no per se impropriety in an ASTM member having a financial interest in the standard-setting activities he is engaged in on behalf of ASTM. Moreover, any concerns ASTM might have

---

[21]In support of its argument, ASTM cites In re Miller, 290 F.3d 263 (5th Cir. 2002). In In re Miller, the trustee of the estate of William Miller sought "indemnification of legal expenses and a litigation judgment entered against Miller and in favor of his former employer, Abrams, Inc." Appellant's br. at 45; see also In re Miller, 290 F.3d at 265-66. By contrast, however, judgment was not (and can never be) entered against Baach and Rogers in the Armor Shield litigation. Moreover, the district court expressly found "there is no evidence that Defendants were acting in bad faith or in a manner which they reasonably believed to be in opposition to the best interests of the Society." ASTM, 2005 WL 1941653, at *12. Accordingly, In re Miller is factually inapposite.

had along the lines it asserts on this point were no doubt addressed by the COS's finding that the G-01 committee did not violate ASTM's condition of balance and had followed ASTM's procedural requirements as well as its criteria for due process– a decision the Board subsequently affirmed. Finally, and most notably, there is simply no evidence that Baach's or Rogers' conduct was detrimental to ASTM. Indeed, so far as we are aware, the permanent standard approved in ASTM's layered process remains in effect today. Certainly, at least, ASTM does not claim that it rescinded the standard by reason of the allegations in the Armor Shield litigation.

For the foregoing reasons, we reject ASTM's request that we reverse the district court's judgment on the basis that the "by reason of" clause precluded indemnification here.

E.    Reasonableness of Armor Shield litigation settlement

ASTM argues next that "[b]ecause the underlying Armor Shield litigation was settled, Rogers and Baach had to show that the settlement was reasonable in order to be entitled to indemnification." Appellant's br. at 47; see also ASTM, 2005 WL 1941653, at *4 (noting indemnification limited to "'expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by [claimant]'") (quoting ASTM Bylaw No. 10.1). ASTM contends that because the district court did not make such a finding, we should reverse its order granting the indemnification award. ASTM is mistaken.

It is true that in Pennsylvania, "[w]here a claim against an indemnitee has been settled, the burden falls on the indemnitee to prove that the settlement was reasonable." County of Delaware v. J.P. Mascaro & Sons, Inc., 830 A.2d 587, 593 (Pa. Super. Ct. 2003). Here, Baach and Rogers submitted expert testimony on the reasonableness of the attorney's fees incurred as well as on the settlement amount. On the other hand, ASTM does not appear to have submitted any expert testimony – and indeed, cites to none in the three pages devoted to its reasonableness argument in its briefs before this court –

35

regarding the unreasonableness of the settlement amount. Therefore it is not surprising that in its order granting defendants a declaratory judgment in their favor, the district court made the following finding of fact:

> The hourly rates charged by the defendants' attorneys and other costs which the defendants incurred in defending and settling the Armor Shield litigation were fair and reasonable, particularly in light of the complexity of the case, the amount sought in the plaintiff's complaint, the inherent risks and overall unpredictability of litigation, and the Cleveland, Ohio marketplace.

ASTM, 2005 WL 1941653, at *7. Even though the district court did not state expressly that the settlement itself was reasonable, given its ruling in defendants' favor, it appears implicitly to have reached just such a conclusion based on the evidence before it.[22]

_____

[22]ASTM takes the position that unless the district court expressly states that the settlement was reasonable, its judgment cannot be upheld. That position might be true in a case involving conflicting evidence on a reasonableness issue, but this case does not fall within that category. Thus, we see no reason for protracting this litigation by remanding this case to the district court to make an express finding on the reasonableness of the settlement.

We, however, do make the following observation regarding the reasonableness of the settlement, taking our computations from the district court opinion and our study of the record. See ASTM, 2005 WL 1941653, at *12. It appears that Rogers' and WRA's attorney's fees in the Armor Shield litigation were $338,083.85. Moreover, Rogers testified that "we could anticipate defense costs roughly equal to what we already expended in order to go to trial on this matter." J.A. at 443. Thus, regardless of what the outcome at trial would have been if the parties had not settled the Armor Shield litigation, by paying $50,000 in settlement of Armor Shield's claim, Rogers and WRA certainly saved money.

Corrpro had over $300,000 in unreimbursed legal fees, costs, and expenses in the Armor Shield litigation that it incurred on behalf of itself and Baach. It settled the case for $1.225 million but National Union

36

We thus decline ASTM's request to reverse the district court's judgment on these grounds as well.

> ### F.  Attribution of settlement amount

ASTM contends that the district court "erred when it calculated the amount of the settlement for which ASTM was required to indemnify Rogers and Baach" insofar as it "treated the entire amount of the settlement and attorneys' fees as if it were attributable to Rogers' and Baach's service on ASTM committees." Appellant's br. at 48. Specifically, ASTM says that, "the Armor Shield Complaint contains numerous allegations relating to conduct by individuals and corporations named as defendants, other than ASTM, conduct that is completely unrelated to Rogers' and Baach's service on ASTM committees" and "Corrpro's Director's and Officer's liability insurer also concluded that the thrust of the Armor Shield Complaint was 'necessarily asserted principally against Corrpro.'" Id. (quoting J.A. at 858). Again, ASTM is mistaken.

Analogizing this case to those in an insurance context, ASTM claims, appellant's br. at 49 (quoting Lang Tendons, Inc.

---

paid $700,000 of that amount so that the net cost of the settlement to Corrpro was $525,000. While we cannot say that it was less expensive for Corrpro and Baach to settle the Armor Shield litigation than it would have been to win after a trial, because their expenses were ongoing it similarly made good sense for them to settle.

Aside from the expense factor the defendants faced the risk of losing in the Armor Shield litigation and suffering damages judgments that might have ruined them. Thus, Rogers testified that Armor Shield was demanding "something like $90 million," id., so that considering his choices the settlement was reasonable. Baach also testified that the settlement was reasonable because Armor Shield was requesting $30 million and that he "understood because of the nature of the allegation [that request] could be multiplied time three to $90 million." Id. at 89. Moreover Baach believed, correctly as it turned out, that National Union would pay a little better than half of the settlement costs. Overall, considering Roger's and Baach's cases either separately or together their settlement was reasonable. The fact is that they were engaged in "bet the company" litigation and it was in their interest that they end it.

v. N. Ins. Co. of N.Y., No. Civ. A. 00-2030, 2001 WL 228920, at *11 (E.D. Pa. Mar. 7, 2001)), "where there has been no adjudication of liability because the insured has settled the claims against it, and no apportionment of the settlement amount among the different counts of the underlying complaint, the court must determine whether an equitable apportionment between covered and uncovered claims must be made." Here, for reasons we set forth above, the district court found that ASTM Bylaw No. 10.1 covered all the claims asserted in the Armor Shield complaint. In doing so the district court indicated that, "[a]lthough WRA and Corrpro paid the entirety of these amounts on behalf of both themselves and Baach and Rogers individually, the settlement agreement did not distinguish what portion(s) of the settlement were attributable to the actions of the individual defendants and which were attributable to the actions of the corporations." ASTM, 2005 WL 1941653, at *12.

The district court went on to state, however, that "nothing through [its] scrutiny of the Armor Shield pleadings . . . suggests that the corporate entities were sued because of the activities of any individuals other than Baach or Rogers." Id.; see also appellees' br. at 50 (asserting the "undisputed testimony at the trial" was that Baach's defense costs were inseparable from those of Corrpro while Rogers' defense costs were inseparable from those of WRA and Baach and Rogers were the only alleged wrongdoers identified in the Armor Shield complaint acting on behalf of Corrpro and WRA respectively). Additionally, it again bears noting that the promulgation of the ES-40 and G-158 standards was the trigger for the Armor Shield litigation. Thus, because the district court has made the determination ASTM says is necessary, we reject ASTM's request that we reverse the district court's order on attribution grounds.

G. Award of attorney's fees in present litigation

ASTM argues finally that the district court erred in holding Baach and Rogers were entitled "to recoup the legal fees that they incurred in defending this declaratory judgment action regarding their right to indemnification." Appellant's br. at 57. Specifically, ASTM says that the district court's holding

38

"confuses an indemnitee's ability to recover fees associated with an underlying liability litigation with its ability to recover fees associated with indemnification litigation." Id. Defendants respond that both ASTM Bylaw No. 10.1 and general principles of equity demand that Baach and Rogers be allowed to "recoup" legal fees incurred in defending this declaratory judgment action regarding their right to indemnification. The merits of the parties' respective arguments aside, we do not have jurisdiction to resolve the issue at this time and thus will dismiss the appeal to the extent it challenges the award of attorney's fees in this case.

As discussed above, our jurisdiction over ASTM's appeal relating to defendants' right to indemnification for their costs and expenses in the Armor Shield litigation is unaffected by the district court's failure to quantify its award of attorney's fees in this action, given the Supreme Court's holding that "an unresolved issue of attorney's fees for the litigation at hand" does not prevent judgment on the merits from being final. Budinich, 486 U.S. at 202, 108 S.Ct. at 1721. Implicit in this finding, however, is the necessary corollary that we do not have jurisdiction to determine those issues pertaining to the "unresolved issue of attorney's fees" itself. See Frangos, 860 F.2d at 72 (dismissing that portion of the appeal dealing with attorney's fees attributable to the case where such fees had not yet been quantified).

ASTM attempts an end-run around this seemingly inescapable point by citing to the doctrine of pendent appellate jurisdiction. Although admitting "[t]he relatively sparse case law . . . suggests the history of pendent appellate jurisdiction is more murky than [clear]," ASTM nonetheless urges that "[w]hatever the limits of pendent appellate jurisdiction may be, ASTM believes the Court would have the power to vacate the district court's ruling that Appellees are entitled to undetermined fees in this case, if it separately reaches a decision that may undermine that ruling, i.e., if it concludes Appellees were not entitled to indemnification for the Armor Shield litigation." Appellant's letter br. at 7. We disagree.

To start with, of course, we are not making the

39

determination ASTM asserts that would empower us to vacate the attorney's fees ruling with respect to this case. In any event, even setting that point aside, in its "broadest formulation," the doctrine of pendent appellate jurisdiction merely "allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its jurisdiction." In re Tutu Wells Contamination Litig., 120 F.3d 368, 382 (3d Cir. 1987), overruled on other grounds by Comuso v. Nat'l R.R. Passenger Corp., 267 F.3d 331, 338-39 (3d Cir. 2001). To this end, we have held "that the discretionary exercise of pendent appellate jurisdiction is appropriate when the issue over which we have jurisdiction cannot be resolved without reference to the otherwise nonappealable issue." Id. (citing Kershner v. Mazurkiewicz, 670 F.2d 440, 449 (3d Cir. 1982)); see also Nat'l Union Fire Ins. Co. v. City Sav., F.S.B., 28 F.3d 376, 382 (3d Cir. 1994) ("We have stated that pendent appellate jurisdiction over an otherwise unappealable order is available only to the extent necessary to ensure meaningful review of an appealable order.") (internal quotations and citation omitted). We are satisfied that the rigorous standard for invoking pendent appellate jurisdiction has not been met here. As the above discussion illustrates, ASTM's appeal regarding defendants' indemnification requests (i.e., "the issue over which we have jurisdiction") plainly can be resolved without reference to whether defendants are entitled to attorney's fees in this litigation (i.e., the "otherwise unappealable order"). Indeed, that is exactly what we have done. Moreover, it is difficult to see why, if we exercised pendent jurisdiction here, such jurisdiction would not always be available in standard two-part litigation such as that involving a third-party claim against an insured followed by the insured's claim against his disclaiming insurance carrier. Overall, we think that it is quite clear that we do not have pendent appellate jurisdiction in this case.

## V. CONCLUSION

For the legal and factual reasons that we have set forth,

40

we will affirm the district court's order entered August 12, 2005 order with respect to settlement costs and attorney's fees in the <u>Armor</u> <u>Shield</u> litigation, dismiss the appeal to the extent that it relates to attorney's fees and costs in this litigation, and remand the case for further proceedings as they pertain to defendants' entitlement to attorney's fees in this litigation.

———